# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――

Argued January 22, 2019        Decided April 16, 2019

No. 18-1279

IN RE: ABD AL-RAHIM HUSSEIN MUHAMMED AL-NASHIRI,
PETITIONER

―――

On Petition for Writ of Mandamus to the
United States Court of Military Commission Review

―――

*Michel D. Paradis*, Counsel, Office of the Chief Defense Counsel, argued the cause for petitioner. With him on the petition for a writ of mandamus and reply was *Brian L. Mizer*.

*Eugene R. Fidell* was on the brief for *amicus curiae* Ethics Bureau at Yale in support of petitioner's petition for a writ of mandamus and prohibition.

*Joseph F. Palmer*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Danielle S. Tarin*, Attorney.

―――

No. 18-1315

―――

IN RE: MARY E. SPEARS AND ROSA A. ELIADES,
PETITIONERS

―――

On Petition for a Writ of Mandamus to the

United States Court of Military Commission Review

———

*Matthew S. Hellman* argued the cause for petitioners. With him on the petition for writ of mandamus and reply were *Keisha Stanford* and *Todd C. Toral*.

*Philip Sundel*, Head, Appellate Section, Military Commissions Defense Organization, was on the brief for *amicus curiae* Chief Defense Counsel for Military Commissions in support of petitioners.

*Danielle S. Tarin*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was *Joseph F. Palmer*, Attorney.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Abd Al-Rahim Hussein Muhammed Al-Nashiri is currently detained at Guantanamo Bay, where he faces capital charges before a military commission. These petitions concern the conduct of Colonel Vance Spath, the military judge who presided over Al-Nashiri's case for four years. Shortly into his tenure—and without disclosing it to Al-Nashiri and his lawyers—Spath applied for employment as an immigration judge in the U.S. Department of Justice. Then, after receiving a job offer but before retiring from the military, Spath found himself locked in a dispute with Al-Nashiri's defense lawyers, three of whom sought to leave the case. Al-Nashiri now seeks a writ of mandamus vacating commission orders issued by Spath, while two of his former lawyers, Mary Spears and Rosa Eliades, seek a writ of mandamus vacating commission orders refusing to

recognize their withdrawal. Because we conclude that Spath's job application to the Justice Department created a disqualifying appearance of partiality, we grant Al-Nashiri's petition for a writ of mandamus, vacate all orders issued by Spath after he applied for the job, and dismiss Spears and Eliades's petition as moot.

## I.

Al-Nashiri stands accused of orchestrating al Qaeda's "boats operation" in the Gulf of Aden, a series of plots culminating in a failed attempt to bomb the U.S.S. *The Sullivans* and the completed bombings of the U.S.S. *Cole* in late 2000 and the M/V *Limburg* in 2002. *See In re Al-Nashiri* (*Al-Nashiri II*), 835 F.3d 110, 113 (D.C. Cir. 2016). Eighteen people lost their lives and almost fifty were injured in these attacks. *See id.* at 114.

Al-Nashiri was captured in 2002, and after spending several years at various CIA "black sites," he was transferred to the U.S. Naval Base at Guantanamo Bay in 2006. *See id.* at 140–41 (Tatel, J., dissenting). The government charged Al-Nashiri with multiple capital offenses, including murder in violation of the law of war and terrorism, for which it seeks the death penalty. *See id.* at 114. After the first military commission convened to try Al-Nashiri disbanded in 2009, the Defense Department convened the second and current commission in 2011.

These ongoing proceedings owe their existence to the Military Commissions Act of 2009 ("MCA"), which establishes a special set of procedures for using "military commissions to try alien unprivileged enemy belligerents." 10 U.S.C. § 948b(a). Borrowing heavily from the procedures governing trial by court-martial, the MCA creates an adversarial system of justice to try unprivileged enemy

belligerents, complete with "trial counsel" to "prosecute in the name of the United States," *id.* § 949c(a); "[d]efense counsel" to represent the accused, *id.* § 949c(b); and a "military judge" to "preside over [the] military commission," *id.* § 948j(a). The MCA also establishes several layers of review of commission decisions, including by the United States Court of Military Commission Review ("CMCR"), which hears both interlocutory appeals and appeals from final judgments, *see id.* §§ 950d, 950f; and by our court, which has "exclusive jurisdiction" to review commission "final judgment[s]" that have been reviewed by the convening authority and the CMCR, *id.* § 950g(a), and—as evidenced by Al-Nashiri's three previous appearances before this court—jurisdiction to hear mandamus petitions. *See Al-Nashiri II*, 835 F.3d at 117 (denying petition for writ of mandamus); *In re Al-Nashiri* (*Al-Nashiri I*), 791 F.3d 71, 78 (D.C. Cir. 2015) (denying petition for writ of mandamus); *In re Al-Nashiri*, No. 09-1274, 2010 WL 4922649, at *1 (D.C. Cir. Nov. 24, 2010) (granting motion for voluntary dismissal of mandamus petition).

Air Force Colonel Vance Spath began presiding over Al-Nashiri's commission in July 2014. But just over a year into his assignment to the case, he applied for a job with the Department of Justice's Executive Office for Immigration Review. Spath, however, never disclosed the fact of his application, much less its details, to Al-Nashiri or to his defense team. Instead, records obtained through a Freedom of Information Act (FOIA) request—documents whose authenticity the government does not dispute—reveal the information we now possess about Spath's job search. *See* Attachments to Petitioner's Reply Brief in Support of His Petition for a Writ of Mandamus and Prohibition ("Reply Attachments"), *In re Al-Nashiri*, No. 18-1279 (D.C. Cir. Nov. 28, 2018) (attaching relevant FOIA documents); Order 1, *In re Al-Nashiri*, No. 18-1279 (D.C. Cir. Jan. 8, 2019) (granting Al-

Nashiri's motion to supplement the record). With the benefit of that newly discovered information, along with the record as it appeared to the parties at the time, we now reconstruct a timeline of the relevant events that unfolded in Al-Nashiri's commission proceedings from November 2015 to the present.

**A.**

Spath submitted his application to an open immigration judge position in the Executive Office for Immigration Review on November 19, 2015. In his application, Spath highlighted his "five years of experience as a trial judge," including that he had been "handpicked" to preside over "the military commissions proceedings for the alleged 'Cole bombing' mastermind"—that is, Al-Nashiri—"at Guantanamo Bay." Reply Attachments B-1 to B-2. He also included as a writing sample an order he issued in Al-Nashiri's case. *See id.* at B-11.

After a "lengthy interview and application process," *id.* at A-10, then-Attorney General Jeff Sessions "signed an order temporarily appointing Mr. Spath as an immigration judge," *id.* at D-1, and Spath received an initial offer of employment in March 2017, *see id.* at A-10. Spath's start date, however, soon became a sticking point. In mid-June, a human resources specialist contacted Spath to notify him that September 18, 2017, had been "established" as his "entrance on duty date," *id.* at A-5, but Spath responded that he was "waiting on confirmation from the Air Force," whose approval he would need before finalizing his retirement from the military, *id.* at A-3. About a month later, in mid-July, Spath sent an email requesting that he be allowed to start on "May 15, 2018 or later." *Id.* at A-11. Reiterating his "extreme[] interest[] in the position," Spath explained that his "status as an active duty member of the Armed Forces"—including that he "remain[ed] detailed to a case at Guantanamo Bay Cuba which requires

significant time to hand to another trial judge"— "complicat[ed] . . . the job offer." *Id.* at A-10. Human resources staff nonetheless concluded that they could not "extend an offer" to Spath while "delay[ing] the [start date] indefinitely." *Id.* at A-9. As a result, in August 2017 they told Spath that "[m]anagement [was] aware of his request to [start] in 2018" but could "not agree to his terms." *Id.* at A-12, A-14. Instead, they would "hold his paperwork and contact him again in January [or] February, 2018." *Id.* at A-14.

While Spath's start-date negotiations were occurring behind the scenes, a separate drama involving Al-Nashiri's defense team was unfolding in Guantanamo. In summer 2017, Al-Nashiri had four lawyers. Leading the team was Richard Kammen, a lawyer who, given his experience "in applicable law relating to capital cases," fulfilled the MCA's requirement that the government must "to the greatest extent practicable" make such "learned" counsel available in capital cases. 10 U.S.C. § 949a(b)(2)(C)(ii). Next were Mary Spears and Rosa Eliades, civilian employees of the Defense Department who had served as Al-Nashiri's assistant defense counsel since 2015. And finally there was Lieutenant Alaric Piette, a Navy judge advocate who had been detailed to the case a few months earlier, in April 2017. *See U.S.S. Cole: Abd al-Rahim Hussein Muhammed Abdu Al-Nashiri (2)* Military Commission Appellate Exhibit ("AE") 339G (July 11, 2017) (defense notice of Piette's detailing). Together, the quartet reported to the Chief Defense Counsel of the Military Commissions Defense Organization, Brigadier General John Baker, the officer in charge of detailing defense counsel and "supervis[ing] all defense activities" in the military commissions. U.S. Department of Defense, Regulation for Trial by Military Commission § 9-1(a)(2) (2016).

The trouble began on June 14, 2017, when Baker informed the lawyers under his supervision that he had lost confidence in the confidentiality of Guantanamo's meeting spaces and recommended that defense counsel refrain from "conduct[ing] any attorney-client meetings at Guantanamo Bay . . . until they know with certainty that improper monitoring of such meetings is not occurring." Corrected Attachments to Petitioner's Petition for a Writ of Mandamus and Prohibition ("Corrected Al-Nashiri Attachments"), Attachment C, at 1, *In re Al-Nashiri*, No. 18-1279 (D.C. Cir. Nov. 4, 2018). Worried about this news, Al-Nashiri's defense team filed motions in the commission requesting permission to notify their client of Baker's warning and seeking to compel discovery into the potential intrusions. *See* AE369HH (June 23, 2017) (motion to advise Al-Nashiri of potential government intrusions into attorney-client communications); AE369PP (July 13, 2017) (motion to compel discovery). And apparently aggravating their concerns, during the pendency of their discovery motion, the lawyers discovered a hidden microphone—which the government represents was a nonfunctional "legacy microphone"—in their meeting room at Guantanamo. Brief of the United States in Opposition ("Opp. to Al-Nashiri") 12, *In re Al-Nashiri*, No. 18-1279 (D.C. Cir. Nov. 16, 2018) (internal quotation marks omitted). Spath, however, denied both the motion for permission to disclose and the motion for discovery, explaining that he lacked "any basis to find there had been an intrusion into attorney-client communications between [Al-Nashiri] and [his] defense team." *U.S.S. Cole: Abd al-Rahim Hussein Muhammed Abdu Al-Nashiri (2)* Military Commission Transcript ("Commission Tr.") 10022 (Oct. 31, 2017); *see also* AE369OO, at 1 (July 7, 2017) (denying motion for permission to notify Al-Nashiri of potential intrusions).

Remaining concerned about their ability to guarantee confidentiality and their inability to communicate those fears

to their client, defense counsel sought expert advice. Kammen solicited guidance from Ellen Yaroshefsky, a professor of legal ethics at Hofstra University School of Law, who opined that because Kammen could not "continue to represent Mr. Al-Nashiri" in a way "consistent with [his] ethical obligation[s]" "to act diligently and competently, to maintain confidentiality, and [to] adhere to the duties of loyalty and communication," he was "required to withdraw." *See* AE389, at 28 (Oct. 16, 2017). Al-Nashiri's three civilian lawyers then sought permission to do just that, requesting that Baker excuse them under Rule for Military Commissions 505(d)(2)(B), which states that "[a]fter formation of [an] attorney-client relationship," "an authority competent to detail" defense counsel "may excuse . . . such counsel only" "[u]pon request of the accused," "application for withdrawal by such counsel," or "[f]or other good cause shown on the record." Rule for Military Commissions 505(d)(2)(B). Baker, citing "all the information [he knew] about this matter—both classified and unclassified," found "good cause" to terminate the representations on October 11, 2017. AE389, at 18 (Oct. 16, 2017) (granting Kammen's request); Pet. Appendix 79, *In re Spears*, No. 18-1315 (D.C. Cir. Nov. 26, 2018) (granting Spears's request); *id.* at 113 (granting Eliades's request).

That left only Lieutenant Piette—a lawyer with five years of legal practice and no meaningful capital-litigation experience—to defend Al-Nashiri against a fully staffed prosecution team consisting of the Chief Prosecutor of the Military Commissions, a civilian Justice Department lawyer on detail to the commission, and two judge advocates. *See* AE338H, at 1 (Feb. 22, 2017) (trial counsel detailing memorandum); AE389K, at 2 (Nov. 6, 2017) (describing Piette's lack of capital-litigation experience); Commission Tr. 10491 (Nov. 10, 2017) (describing Piette's legal experience). Piette informed the commission of his colleagues' withdrawal

and moved to abate proceedings, citing Rule for Military Commissions 506(b), which requires, over and above the MCA's "to the greatest extent practicable" qualification, *see* 10 U.S.C. § 949a(b)(2)(C)(ii), that "the accused [in a capital case] has the right to be represented . . . by at least one . . . counsel who is learned in applicable law relating to capital cases," Rule for Military Commissions 506(b).

Spath denied the motion to abate, holding that the lawyers required his permission to withdraw and further finding "no good cause . . . to warrant [their] excusal." AE389F, at 4–5 (Oct. 27, 2017). "Mr. Kammen, Ms. Eliades, and Ms. Spears," he stated, "remain counsel of record in this case, and are ordered to appear at the next scheduled hearing of this Commission." AE389A, at 1 (Oct. 16, 2017). When the lawyers did not return, Spath ruled that proceedings would continue even absent learned counsel. Al-Nashiri did not "have a right to learned counsel . . . at every aspect of every proceeding," he stated, "especially when it doesn't relate to capital matters." Commission Tr. 10084 (Nov. 3, 2017).

From November 2017 onwards, then, the commission proceeded through various "pretrial issues" that, in Spath's view, were "not related to capital matters." Commission Tr. 10166 (Nov. 3, 2017). The prosecution presented two witnesses who offered testimony regarding a previously filed defense motion to suppress. *See* Commission Tr. 10086–10153 (Nov. 3, 2017) (testimony of Stephen Gaudin); Commission Tr. 10201–42 (Nov. 7, 2017) (testimony of Robert McFadden). The commission concluded the deposition (which had begun several months earlier) of Al-Nashiri's alleged co-conspirator—a witness who, in the prosecution's opinion, had previously offered "devastating direct and corroborated evidence." Commission Tr. 10174 (Nov. 3, 2017); *see also* Commission Tr. 10244 (Nov. 7, 2017) (summarizing the

deposition). And across several multi-day hearing sessions, the commission conducted "preadmission of evidence," a process that involved over thirty prosecution witnesses whose testimony laid the "foundation for real [physical] evidence," which Spath then "conditionally admitted." Commission Tr. 10483–94 (Nov. 10, 2017); *see also* Commission Tr. 11140–45 (Jan. 19, 2018) (detailing Spath's "preadmission" procedure).

Throughout these proceedings, Piette consistently reiterated his position that because Al-Nashiri stood accused of capital crimes, all proceedings were capital proceedings at which Al-Nashiri had the right to capital-qualified counsel. Confessing his own "lack of qualifications" "to assist, advise, or represent Mr. Al-Nashiri in his capital trial," AE389K, at 2–3 (Nov. 6, 2017), Piette declined to make arguments, cross-examine witnesses, or otherwise substantively participate in any proceedings without the presence of learned counsel. Twice more he moved for abatements, *see id.* at 1; Commission Tr. 11689 (Feb. 12, 2018), but Spath remained unpersuaded, accusing "the defense community [of] making strategic and tactical decisions to delay," Commission Tr. 11072 (Jan. 19, 2018).

As time went on, Spath became increasingly frustrated with defense counsel. In December he issued orders directing Spears and Eliades "to appear . . . and continue representing the Accused . . . or show cause as to why [they] cannot continue." AE389AA, at 1 (Dec. 11, 2017) (order to Eliades); AE389BB, at 1 (Dec. 11, 2017) (order to Spears). Spears and Eliades responded with lengthy letters explaining their reasons for withdrawal. *See* AE389KK, at 1 (Jan. 17, 2018) (Eliades's letter); AE389LL, at 1 (Jan. 17, 2018) (Spears's letter). Then, at Spath's direction, the government attempted to "secure [Spears's and Eliades's] attendance" by twice serving them

with subpoenas. Commission Tr. 11054 (Jan. 19, 2018). The lawyers moved to quash each one.

The two subplots of Spath's story—the judge's employment negotiations with the Executive Office for Immigration Review and his standoff with Al-Nashiri's defense counsel—reached their denouement the week of February 12, 2018. On Monday, Spath orally denied Spears's and Eliades's motions to quash, leaving in place the subpoenas requiring their appearance via videoconference the following day. *See* Commission Tr. 11536 (Feb. 12, 2018). But when, on Tuesday morning, Spears and Eliades informed the government that they would not appear, *see* AE389XX, at 1 (Feb. 13, 2018), Spath directed the government to draft writs of attachment for their arrest so that, as he put it, he would have "options available . . . when we get here tomorrow," Commission Tr. 11914–15 (Feb. 13, 2018). Spath, however, made no decisions on Wednesday or Thursday. Instead, he explained that he was "still trying to figure out what to do," Commission Tr. 11919 (Feb. 14, 2018), and that he would "think about this overnight," Commission Tr. 12355 (Feb. 15, 2018).

But Spath apparently was mulling a different important decision on Thursday night. Earlier that day, he had received an email from a human resources specialist in the Executive Office for Immigration Review informing him that he was "able to [start] with [the] agency . . . on July 8, 2018." Reply Attachments A-19. "When you have returned to the [S]tates," she wrote, "please let me know so we can arrange a time to call you and go over the Immigration Judge appointment information." *Id.* "Thank you," Spath replied. *Id.* at A-18. "I get back over the weekend. I will give you a call on Tuesday." *Id.*

The following morning, Spath abated "indefinitely" the commission proceedings against Al-Nashiri. Commission Tr. 12376 (Feb. 16, 2018). Declaring that "[o]ver the last five months . . . [his] frustration with the defense [had] been apparent," Spath concluded that "[w]e need action from somebody other than me" or else "[w]e're going to continue to spin our wheels and go nowhere." Commission Tr. 12364, 12374 (Feb. 16, 2018). He added, "[I]t might be time for me to retire, frankly. That decision I'll be making over the next week or two." Commission Tr. 12374 (Feb. 16, 2018).

**B.**

The government soon appealed Spath's abatement order to the Court of Military Commission Review. During the pendency of that appeal, Spath submitted his retirement paperwork to the Air Force, and the process began to find "a new judge with high enough clearance" for reassignment to Al-Nashiri's case. Reply Attachments A-20. Several months and another start-date delay later, *see id.* at A-21, Spath announced his retirement, and Colonel Shelly Schools took over as the military judge in Al-Nashiri's case on August 6, 2018, *see* AE302A, at 1 (Oct. 15, 2018).

At that time, all Al-Nashiri knew was that Spath planned to retire and that Schools had replaced him; Spath had given no indication that he had applied for and accepted a job in the Justice Department. But in summer 2018, Al-Nashiri's defense team—which by this time had added Captain Brian Mizer, one of Al-Nashiri's former lawyers who had been recalled to active duty—received "credible reports" that Spath had been pursuing employment as an immigration judge. Petition for a Writ of Mandamus and Prohibition ("Al-Nashiri Pet.") 23, *In re Al-Nashiri*, No. 18-1279 (Oct. 4, 2018). Al-Nashiri's lawyers submitted a request for discovery on the matter, but the

government refused, calling the reports "unsubstantiated assertions" and arguing that the "[d]efense request offers no basis to believe that the former presiding military judge has applied for a position with the [Justice Department] or even contacted the [Justice Department] regarding employment." Corrected Al-Nashiri Attachments, Attachment B, at 1. Less than a week later, however, an Associated Press photograph surfaced showing Spath standing next to Attorney General Sessions at a welcome ceremony for new immigration judges. *See* Carol Rosenberg, *Controversial Guantánamo Judge Joins Jeff Sessions in Immigration Judge Ceremony*, McClatchy (Sept. 14, 2018), https://www.mcclatchydc.com/news/nation-world/national/national-security/article218303315.html.

Arguing that Spath's employment negotiations created a disqualifying appearance of bias, Al-Nashiri filed a motion in the Court of Military Commission Review seeking an order compelling the government to produce the requested discovery and vacating Spath's rulings. *See* Motion 1, *United States v. Al-Nashiri*, No. 18-002 (CMCR Sept. 13, 2018). The CMCR denied that motion in late September, explaining that because Al-Nashiri had yet to raise his allegations in the still-abated commission, the appellate court lacked a "factual record . . . at the trial level to support [Al-Nashiri's] allegations." Order 2, *United States v. Al-Nashiri*, No. 18-002 (CMCR Sept. 28, 2018). Apparently construing Al-Nashiri's request as one for a writ of mandamus, the court then concluded that Al-Nashiri had failed to "show[] that 'a reasonable and informed observer would question [Spath's] impartiality.'" *Id.* (quoting *SEC v. Loving Spirit Foundation Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004)).

The same day the CMCR issued its order, the Justice Department announced "the investiture of . . . the largest class" of immigration judges "in the agency's history"; number 41 on

the list of 46 names was Colonel Vance Spath. U.S. Department of Justice, Office of Public Affairs, *EOIR Announces Largest Ever Immigration Judge Investiture* (Sept. 28, 2018), https://www.justice.gov/opa/pr/eoir-announces-largest-ever-immigration-judge-investiture; *see also* U.S. Department of Justice, Executive Office for Immigration Review, *Notice, Executive Office for Immigration Review Swears in 46 Immigration Judges* 12 (Sept. 28, 2018), https://www.justice.gov/eoir/page/file/1097241/download.

The following week, Al-Nashiri filed a petition for a writ of mandamus in this court. But that does not quite end the story.

On October 11, 2018, the CMCR issued its opinion in the government's appeal of Spath's February 2018 abatement order. Asserting "pendent jurisdiction" over the issue of Al-Nashiri's representation, the court held that the "right to learned counsel is not absolute" but rather exists "only . . . to the 'greatest extent practicable.'" *United States v. Al-Nashiri*, No. 18-002, slip op. at 21, 34 (CMCR Oct. 11, 2018) (quoting 10 U.S.C. § 949a(b)(2)(C)(ii)). The CMCR also held that Spath "had the responsibility to review the [Chief Defense Counsel's] decision" to excuse Al-Nashiri's defense counsel and that "the record does not establish good cause for" their excusal. *Id.* at 37. Concluding, then, that Al-Nashiri's defense counsel "remain[ed] counsel of record," the court vacated Spath's abatement order and directed "Al-Nashiri's trial . . . to resume forthwith." *Id.* at 38. While, in its words, "retain[ing] jurisdiction over the issue of Al-Nashiri's representation," the CMCR otherwise remanded the case "to the military judge for proceedings consistent with [its] decision." *Id.*

With the abatement lifted, Al-Nashiri filed motions in both the CMCR and this court requesting to stay commission proceedings pending our resolution of his mandamus petition.

The CMCR denied that motion on November 2, 2018, opining that "[t]he principal flaw in Al-Nashiri's underlying motion to disqualify Judge Spath is that it should have been made in the military commission where a factual record could have been created." Order 3, *United States v. Al-Nashiri*, No. 18-002 (CMCR Nov. 2, 2018). "If Al-Nashiri moves to disqualify Judge Spath" once commission proceedings resume, the court explained, "the new judge will decide whether Judge Spath acted inappropriately." *Id.* at 4. But Al-Nashiri never presented his argument to Judge Schools, as we issued a stay on November 7, 2018.

In fact, Judge Schools's tenure on Al-Nashiri's case did not last long. By letter dated January 4, 2019, the government's attorneys in this case informed us that, upon conducting an investigation prompted by defense counsel's request, they had recently discovered that "Judge Schools intends to retire from the military in the relatively near future," as she, too, had "applied for and . . . accepted a post-retirement immigration judge position." Fed. R. App. P. 28(j) Letter 1, *In re Al-Nashiri*, No. 18-1279 (D.C. Cir. Jan. 4, 2019). Army Colonel Lanny J. Acosta is now assigned to Al-Nashiri's case.

Now before us are two petitions for writs of mandamus: one filed by Al-Nashiri, who seeks a writ directing either "the vacatur of the orders convening the military commission" against him or "the vacatur of all orders entered by [Spath] whilst he was under a concealed and disqualifying ethical conflict," Al-Nashiri Pet. 1; and the other filed by Spears and Eliades, who seek mandamus relief "vacating the CMCR's October 11, 2018 Opinion compelling [them] to serve as . . . [d]efense [c]ounsel after they were lawfully excused," Petition for Writ of Mandamus 1, *In re Spears*, No. 18-1315 (Nov. 21, 2018). We begin with Al-Nashiri's petition.

16

**II.**

The Military Commissions Act of 2009 vests this court with jurisdiction to review only "final judgment[s] rendered by . . . military commission[s]." 10 U.S.C. § 950g(a). But because the All Writs Act permits us to "issue all writs necessary or appropriate in aid of [our] . . . jurisdiction[]," 28 U.S.C. § 1651(a), "we can issue a writ of mandamus *now* to protect the exercise of our appellate jurisdiction *later*," *Al-Nashiri I*, 791 F.3d at 76. As we explained in *In re Mohammad*, where we removed a different judge from a military commission case for expressing his opinion on the guilt of the accused, mandamus provides "an appropriate vehicle for seeking recusal of a judicial officer during the pendency of a case, as 'ordinary appellate review' following a final judgment is 'insufficient' to" remove the insidious taint of judicial bias. 866 F.3d 473, 475 (D.C. Cir. 2017) (quoting *Al-Nashiri I*, 791 F.3d at 79).

Confident of our jurisdiction to consider mandamus petitions seeking judicial disqualification, "[w]e are nonetheless mindful of the . . . important purpose" served by the MCA's final judgment rule and therefore of the need to "faithfully enforce the traditional prerequisites for mandamus relief." *Al-Nashiri I*, 791 F.3d at 78. For a court to grant a writ of mandamus, three conditions must be met: the petitioner must demonstrate "that [his] right to issuance of the writ is clear and indisputable," "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires," and "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 380–81 (2004) (alterations in original) (internal quotation marks omitted). We address each requirement in turn, beginning with Al-Nashiri's right to relief.

17

**A.**

Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label. And because "'[d]eference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges,'" jurists must avoid even the appearance of partiality. *United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001) (quoting Code of Conduct for United States Judges, Canon 1 cmt. (2000)). "Such a stringent rule," to be sure, "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *In re Murchison*, 349 U.S. 133, 136 (1955). But "'to perform its high function in the best way,'" the Supreme Court has emphasized, "'justice must satisfy the appearance of justice.'" *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988) (quoting *In re Murchison*, 349 U.S. at 136).

The principle that judges must preserve both the reality and appearance of impartiality finds expression in many sources of law. "It is axiomatic," of course, that due process demands an unbiased adjudicator, and the Supreme Court has therefore identified several circumstances in which "'the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876–77 (2009) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). But the "Due Process Clause demarks only the outer boundaries of judicial disqualifications," *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 828 (1986), and various statutes and codes of conduct, in service of their essential function "to maintain the integrity of the judiciary and the rule of law," "provide more protection than due process requires," *Caperton*, 556 U.S. at 889–90. These assembled sources of rules governing judicial

conduct—including section 455 of Title 28 of the United States Code, the Code of Conduct for United States Judges, the American Bar Association's Model Code of Judicial Conduct, and the Rules for Courts-Martial—all speak with one clear voice when it comes to judicial recusal: judges "shall disqualify" themselves in any "proceeding in which [their] impartiality might reasonably be questioned." 28 U.S.C. § 455(a); Code of Conduct for United States Judges, Canon 3C(1); American Bar Association, Model Code of Judicial Conduct, Rule 2.11; Rule for Courts-Martial 902(a).

The Rules for Military Commissions are no different. Rule 902(a) requires that a "military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." Like the judicial recusal statute they mirror, the Rules for Military Commissions focus not on whether a military judge harbored actual bias, but rather on what "would appear to a reasonable person . . . knowing all the circumstances." *Liljeberg*, 486 U.S. at 860–61 (quoting *Health Services Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986)); *see also* Opp. to Al-Nashiri 43 (acknowledging that the "Rules for Military Commissions incorporate the judicial recusal statute"). "[A]ll that must be demonstrated to compel recusal," then, is "a showing of an appearance of bias . . . sufficient to permit the average citizen reasonably to question a judge's impartiality." *United States v. Heldt*, 668 F.2d 1238, 1271 (D.C. Cir. 1981).

In asking what would cause a reasonable person to doubt a judge's neutrality, we recognize the somewhat "subjective character of this ostensibly objective test." *Pepsico, Inc. v. McMillen*, 764 F.2d 458, 460 (7th Cir. 1985). That said, relying on section 455, judicial codes of conduct, precedent, and our own judgment as ethics-bound jurists to guide us, we conclude

that, based on the totality of the circumstances, Judge Spath's conduct falls squarely on the impermissible side of the line.

To begin with, it is beyond question that judges may not adjudicate cases involving their prospective employers. The risk, of course, is that an unscrupulous judge may be tempted to use favorable judicial decisions to improve his employment prospects—to get an application noticed, to secure an interview, and ultimately to receive an offer. And even in the case of a scrupulous judge with no intention of parlaying his judicial authority into a new job, the risk that he may *appear* to have done so remains unacceptably high. Simply put, "a judge cannot have a prospective financial relationship with one side yet persuade the other that he can judge fairly in the case." *Id.* at 461. This is why, for example, the Judicial Conference's Committee on Codes of Conduct has opined that "[a]fter the initiation of any discussions with a [potential employer], no matter how preliminary or tentative the exploration may be, the judge must recuse . . . on any matter in which the [prospective employer] appears." Judicial Conference of the United States Committee on Codes of Conduct, Advisory Opinion No. 84: Pursuit of Post-Judicial Employment (April 2016), *in Guide to Judiciary Policy*, vol. 2, pt. B, at 125, 125 (2019); *see also id.* (explaining that "[a]lthough this opinion discusses exploration of employment opportunities with a law firm, the principles discussed would apply to other potential employers").

This general prohibition applies with equal force to judges serving on military commissions, where, as in every other court, "[t]he dignity and independence" of the commission "are diminished when [a] judge comes before the lawyers in [a] case in the role of a suppliant for employment." *Pepsico*, 764 F.2d at 461. The question, then, is whether Spath's prospective employer was a party to Al-Nashiri's case such that it "would appear to a reasonable person . . . knowing all the

circumstances," *Liljeberg*, 486 U.S. at 860 (internal quotation marks omitted), that Spath's impartiality was in jeopardy. To answer this inquiry, we identify first the "employer" and then the "party." If they are one and the same, then an intolerable appearance of partiality exists.

As to the first inquiry—who is Spath's employer?—although the Justice Department is a complex institution with many offices performing many different functions, it is enough to decide this case to know that the Attorney General himself is directly involved in selecting and supervising immigration judges. Unlike administrative law judges, who are hired through a selection process administered by the Office of Personnel Management, immigration judges such as Spath are appointed directly by the Attorney General. *Compare* 5 C.F.R. § 930.204 ("An agency may appoint an individual to an administrative law judge position only with prior approval of [the Office of Personnel Management]"), *with* 8 U.S.C. § 1101(b)(4) ("The term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review . . . ."). Once appointed, moreover, immigration judges are "subject to such supervision" and obligated to "perform such duties as the Attorney General shall prescribe." 8 U.S.C. § 1101(b)(4).

As to the second inquiry—who is a party to Al-Nashiri's case?—the government acknowledges that the "Attorney General . . . and the Justice Department have some involvement in the [m]ilitary [c]ommission system" but nonetheless argues that "whatever level that involvement is," it is "much less than the Defense Department['s]." Oral Arg. Tr. 34:16–25, *In re Al-Nashiri*, No. 18-1279 (D.C. Cir. Jan. 22, 2019). This, of course, is true. The MCA gives the Secretary of Defense, not the Attorney General, authority to convene

military commissions, *see* 10 U.S.C. § 948h, and as a formal matter, "trial counsel of a military commission . . . prosecute in the name of the United States," not any particular agency, 10 U.S.C. § 949c(a). On issues of judicial impartiality, however, we confront a question of reasonable appearances, not just formal designations. And we cannot escape the conclusion that the average, informed observer would consider Spath to have presided over a case in which his potential employer appeared. Two facts compel this conclusion.

First, the Justice Department, presumably with the approval of the Attorney General, detailed one of its lawyers to prosecute Al-Nashiri. *See* Rule for Military Commission 501(b) (requiring that "if [civilian trial] counsel are employed by another government agency," they may be detailed only "with the approval of the head of that agency"). The Rules for Military Commissions themselves label this prosecutor a "party" to the proceedings. *See* Rule for Military Commissions 103(a)(24)(B) (defining "party" to include "[a]ny trial or assistant trial counsel representing the United States" in the military commission). And Commission transcripts reveal that this Justice Department lawyer's participation was far from perfunctory; indeed, he appears to have been the prosecution team's second-in-command for at least part of the time. *See* AE338H, at 1 (Feb. 22, 2017) (detailing memorandum designating the Justice Department lawyer as "Trial Counsel" and two judge advocates as "Managing Assistant Trial Counsel" and "Assistant Trial Counsel," respectively).

Second, aside from the particulars of Al-Nashiri's case, the Attorney General plays an important institutional role in military commissions more generally. The Attorney General appears by name twice in the Military Commissions Act: first in section 949a, which permits "the Secretary of Defense, in consultation with the Attorney General" to establish rules for

"trials by military commission" that depart from "the procedures . . . otherwise applicable in general courts-martial"; and second in section 950h, which allows appellate counsel appointed by the Secretary of Defense to "represent the United States" in appeals beyond the CMCR only if "requested to do so by the Attorney General." 10 U.S.C. §§ 949a(b)(1), 950h(b)(2). The Regulation for Trial by Military Commission, too, contemplates that the Attorney General will detail Justice Department lawyers to commission proceedings with some regularity. "The Chief Prosecutor shall supervise all trial counsel," the Regulation instructs, "including any special trial counsel of the Department of Justice who may be made available by the Attorney General of the United States." U.S. Department of Defense, Regulation for Trial by Military Commission § 8-6(a) (2011).

In sum, the Attorney General was a participant in Al-Nashiri's case from start to finish: he has consulted on commission trial procedures, he has loaned out one of his lawyers, and he will play a role in defending any conviction on appeal. The challenge Spath faced, then, was to treat the Justice Department with neutral disinterest in his courtroom while communicating significant personal interest in his job application. Any person, judge or not, could be forgiven for struggling to navigate such a sensitive situation. And that is precisely why judges are forbidden from even trying. *See Scott v. United States*, 559 A.2d 745, 750 (D.C. 1989) (explaining that a judge's obligation to avoid seeking employment with a party appearing before him does not "change simply because the prospective employer is a component of the Department of Justice").

The fact of Spath's employment application alone would thus be enough to require his disqualification. But Spath did yet more to undermine his apparent neutrality.

First, in his job application, Spath chose to emphasize his role as the presiding judge over Al-Nashiri's commission. He boasted that he had been "handpicked by the top lawyer of the Air Force to be the trial judge" on "the military commissions proceedings for the alleged 'Cole bombing' mastermind," Reply Attachments B-2, and he even supplied an order from Al-Nashiri's case as his writing sample, *see id.* at B-11. Spath thus affirmatively called the Justice Department's attention to his handling of Al-Nashiri's case, making his performance as presiding judge a key point in his argument for employment.

Second, while Spath made sure to tell the Justice Department about his assignment to Al-Nashiri's commission, he was not so forthcoming with Al-Nashiri. At no point in the two-plus years after submitting his application did Spath disclose his efforts to secure employment with the Executive Office for Immigration Review. Indeed, perhaps most remarkably, less than twenty-four hours after receiving his July 2018 start date, Spath indefinitely abated commission proceedings, musing on the record that "over the next week or two" he would decide whether "it might be time . . . to retire." Commission Tr. 12374 (Feb. 16, 2018); *see also supra* at 11–12. Given this lack of candor, a reasonable observer might wonder whether the judge had done something worth concealing. *Cf.* Rule for Military Commissions 902(e) (permitting, in some circumstances, "the parties to [a] proceeding" to waive judicial disqualification but only if the waiver "is preceded by a full disclosure on the record of the basis for disqualification").

It is, of course, entirely possible that Spath's orders were the product of his considered and unbiased judgment, unmotivated by any improper considerations. But that is beside the point: "[a]ppearance may be all there is, but that is enough." *Microsoft Corp.*, 253 F.3d at 115. As the Supreme Court has

explained, "[t]he problem . . . is that people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Liljeberg*, 486 U.S. at 864–65. Spath's job application, therefore, cast an intolerable cloud of partiality over his subsequent judicial conduct. Al-Nashiri thus has a clear and indisputable right to relief.

**B.**

Because "[m]andamus is a 'drastic' remedy, 'to be invoked only in extraordinary circumstances,'" *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)), it is available only if "no adequate alternative remedy exists," *Barnhart v. Devine*, 771 F.2d 1515, 1524 (D.C. Cir. 1985). Therefore, "[g]iven the availability of ordinary appellate review" after conviction, Al-Nashiri "must identify some 'irreparable' injury that will go unredressed if he does not secure mandamus relief" now. *Al-Nashiri I*, 791 F.3d at 79 (quoting *Banks v. Office of Senate Sergeant-at-Arms & Doorkeeper of U.S. Senate*, 471 F.3d 1341, 1350 (D.C. Cir. 2006)).

Strict as it is, that standard is easily satisfied here. While "[t]he ordinary route to relief . . . is to appeal from [a] final judgment," "[w]hen the relief sought is recusal of a disqualified judicial officer, . . . the injury suffered by a party required to complete judicial proceedings overseen by that officer is by its nature irreparable." *Cobell v. Norton*, 334 F.3d 1128, 1139 (D.C. Cir. 2003). After conviction, no amount of appellate review can remove completely the stain of judicial bias, both "because it is too difficult to detect all of the ways that bias can influence a proceeding" and because public "confidence . . . is irreparably dampened once 'a case is allowed to proceed before

a judge who appears to be tainted.'" *Al-Nashiri I*, 791 F.3d at 79 (quoting *In re School Asbestos Litigation*, 977 F.2d 764, 776 (3d Cir. 1992), *as amended* (Oct. 23, 1992)). The same is true for proceedings in which the disqualified adjudicator is gone but his orders remain. If a judge "should have been recused from the . . . proceedings, then any work produced" by that judge "must also be 'recused'—that is, suppressed." *In re Brooks*, 383 F.3d 1036, 1044 (D.C. Cir. 2004).

In addition to Spath's many oral rulings from the bench, the government advises us that he "issued approximately 460 written orders" in Al-Nashiri's case. Opp. to Al-Nashiri 8. Requiring Al-Nashiri to proceed under the long shadow of all those orders, even if enforced by a new, impartial military judge, would inflict an irreparable injury unfixable on direct review. Al-Nashiri thus has no adequate remedy for Spath's conduct other than to scrub Spath's orders from the case at the earliest opportunity.

The government, however, proposes another option: although the CMCR in September 2018 rejected Al-Nashiri's request to disqualify Spath and vacate his orders, *see* Order 2, *United States v. Al-Nashiri*, No. 18-002 (CMCR Sept. 28, 2018), we are now told that Al-Nashiri may yet "assert[] his disqualification claims in the still-pending military commission," Opp. to Al-Nashiri 29. True, in a November 2018 order—entered after Al-Nashiri had filed his petition for mandamus in our court—the CMCR stated that its "disposition of Al-Nashiri's prior motion [for disqualification] does not foreclose him from making a motion before the military commission seeking the same relief." Order 3, *United States v. Al-Nashiri*, No. 18-002 (CMCR Nov. 2, 2018). But despite the CMCR's belated attempt to narrow the effect of its September 2018 denial, the enduring consequences of that appellate body's previous rulings—two in particular—would

significantly constrain and maybe even bar the new military judge's ability to afford Al-Nashiri a complete remedy. First, the CMCR has "retain[ed] jurisdiction over the issue of Al-Nashiri's representation." *Al-Nashiri*, slip op. at 38. Although the import of this statement is not entirely clear, it appears that any new military judge would lack authority to issue orders pertaining to Al-Nashiri's defense team—a subject on which Spath made many rulings. Second, the CMCR has already ruled that, at least under the heightened mandamus standard, "[Al-Nashiri] has not shown that a reasonable and informed observer would question [Spath's] impartiality." Order 2, *United States v. Al-Nashiri*, No. 18-002 (CMCR Sept. 28, 2018) (internal quotation marks omitted). The factual findings and legal conclusions embedded in this statement remain law of the case. *Cf. Al-Nashiri*, slip op. at 37 (stating that the CMCR's "holdings are . . . the law-of-the-case and the law of the military commissions even if [the CMCR] did not have pendent jurisdiction to decide them").

Accordingly, if Al-Nashiri moved in the military commission to disqualify Spath, the new military judge would find himself incapable of vacating all the orders necessary to purge the proceedings of Spath's lingering and disqualified influence. Al-Nashiri has thus demonstrated that his sole means for adequate relief lies with this mandamus petition.

## C.

Last, we consider whether issuance of a writ of mandamus "is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. Because this petition seeks vacatur of judicial decisions, our discretion is guided by the three *Liljeberg* factors: "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial

process." 486 U.S. at 864. Two features of this case weigh especially heavily.

To begin with, we cannot forget that the government seeks to impose the ultimate penalty against Al-Nashiri. Because "the imposition of death by public authority is . . . profoundly different from all other penalties," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality opinion), "the [Supreme] Court has been particularly sensitive to ensure that every safeguard is observed," *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality opinion). In no proceeding is the need for an impartial judge more acute than one that may end in death.

Moreover, as the Supreme Court explained in *Liljeberg*, our "willingness to enforce" disqualification "may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." *Liljeberg*, 486 U.S. at 868. Although it was Spath who had the ultimate obligation to recuse himself, the judge was hardly alone in his lack of diligence. The Justice Department knew that Spath had applied for an immigration judge job and that he continued to preside over Al-Nashiri's case while awaiting his start date. The prosecution, upon receiving the defense's request for discovery into Spath's employment negotiations, refused to investigate the matter and instead accused Al-Nashiri's team of peddling "unsubstantiated assertions." Corrected Al-Nashiri Attachments, Attachment B, at 1; *see also supra* at 12–13. On the very same day the CMCR denied Al-Nashiri's motion to compel discovery, citing his failure to "show[] that 'a reasonable and informed observer would question [Spath's] impartiality,'" Order 2, *United States v. Al-Nashiri*, No. 18-002 (CMCR Sept. 28, 2018) (quoting *Loving Spirit*, 392 F.3d at 493), the Justice Department announced Spath's investiture as

an immigration judge, *see supra* at 13–14. And just a few months ago, the government informed this court that the military judge who replaced Spath—the same judge the CMCR and the government once suggested should hear Al-Nashiri's disqualification motion in the first instance to "decide whether Judge Spath acted inappropriately," Order 3, *United States v. Al-Nashiri*, No. 18-002 (CMCR Nov. 2, 2018)—was herself engaged in apparently undisclosed employment negotiations with the Justice Department during the pendency of this very case, *see supra* at 15.

Although a principle so basic to our system of laws should go without saying, we nonetheless feel compelled to restate it plainly here: criminal justice is a shared responsibility. Yet in this case, save for Al-Nashiri's defense counsel, all elements of the military commission system—from the prosecution team to the Justice Department to the CMCR to the judge himself— failed to live up to that responsibility. And we cannot dismiss Spath's lapse as a one-time aberration, as Al-Nashiri's is not the first meritorious request for recusal that our court has considered with respect to military commission proceedings. *See In re Mohammad*, 866 F.3d at 475–77 (issuing a writ of mandamus recusing a CMCR judge for expressing an opinion about the accused's guilt). That said, we hasten to add that none of the foregoing requires the Defense Department to change the way it assigns military judges, or the Justice Department the way it hires immigration judges, or the CMCR the way it considers appeals. But this much is clear: whenever and however military judges are assigned, rehired, and reviewed, they must always maintain the appearance of impartiality demanded by Rule for Military Commission 902(a). It would seem, therefore, that some additional "encourag[ement] . . . to more carefully examine possible grounds for disqualification," *Liljeberg*, 486 U.S. at 868, would be especially "appropriate under the circumstances," *Cheney*, 542 U.S. at 381.

On the other side of the ledger, the government warns that granting Al-Nashiri's petition would require relitigation of commission proceedings, thus costing additional time and resources. But while the public unquestionably possesses, as the government argues, an "interest in avoiding unwarranted delays in the administration of justice," Opp. to Al-Nashiri 50, surely the public's interest in efficient justice is no greater than its interest in impartial justice. Any institution that wields the government's power to deny life and liberty must do so fairly, as the public's ultimate objective is not in securing a conviction but in achieving a just outcome. Given that Al-Nashiri's case remains at the pre-trial stage, we are confident that the costs of granting the writ are not intolerably high, especially when weighed against the hefty burdens that would be shouldered by both Al-Nashiri and the public were his military commission to proceed under a cloud of illegitimacy.

A writ is therefore more than "appropriate under the circumstances." *Cheney*, 542 U.S. at 381. The much harder task is to fashion its scope. Recognizing the powerful case for dissolving the current military commission entirely (Al-Nashiri's preferred relief), we are ultimately satisfied that a writ of mandamus directing vacatur of all orders entered by Spath after November 19, 2015—the date of his application— will sufficiently scrub the case of judicial bias without imposing an unnecessarily "draconian remedy." *Liljeberg*, 486 U.S. at 862. Additionally, because "ordinary appellate review" on the merits cannot "detect all of the ways that bias can influence a proceeding," *Al-Nashiri I*, 791 F.3d at 79, we shall vacate any CMCR orders that reviewed now-vacated Spath orders, including the CMCR's October 11, 2018, opinion affirming Spath's rulings regarding Al-Nashiri's defense counsel.

In ordering such relief, we fully recognize the burden the writ will place on the government, the public, and Al-Nashiri himself. Despite these costs, however, we cannot permit an appearance of partiality to infect a system of justice that requires the most scrupulous conduct from its adjudicators, "for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1909 (2016).

## III.

This brings us to Spears and Eliades's petition. Arguing that General Baker lawfully excused them from Al-Nashiri's defense team on October 11, 2017, the two seek a writ of mandamus vacating the CMCR's direction that as "counsel of record" they remain "obligat[ed] to continue their representation of Al-Nashiri." *Al-Nashiri*, slip op. at 38. Vacating all Spath's orders issued after November 19, 2015, as well as all CMCR decisions reviewing those orders, including the October 11, 2018, opinion, thus affords Spears and Eliades all the relief they request.

Spears and Eliades acknowledge that their petition seeks relief no broader than Al-Nashiri's, but they nonetheless worry that negative professional consequences could flow from Spath's adverse rulings. *See* Oral Arg. Tr. 5:6–7:14, *In re Spears*, No. 18-1315 (D.C. Cir. Jan. 22, 2019) (discussing the lingering risk of "serious professional consequences" while recognizing that affording Al-Nashiri the relief we have ordered "would give [Spears and Eliades] what [they are] looking for"). But we cannot imagine that any state bar association or other professional licensing body—especially once presented with this opinion—would initiate disciplinary

proceedings against lawyers based solely on the orders of a judge ethically disqualified from issuing them.

Because issuance of a writ in Al-Nashiri's case will afford Spears and Eliades "'all the relief that [they have] sought,'" we shall dismiss Spears and Eliades's petition as moot. *Schnitzler v. United States*, 761 F.3d 33, 37 (D.C. Cir. 2014) (quoting *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013)); *see also Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies.").

## IV.

We do not take lightly the crimes that Al-Nashiri stands accused of committing. To the contrary, the seriousness of those alleged offenses and the gravity of the penalty they may carry make the need for an unimpeachable adjudicator all the more important. We therefore grant Al-Nashiri's petition for a writ of mandamus and vacate all orders issued by Judge Spath on or after November 19, 2015, and we further vacate all decisions issued by the CMCR reviewing such orders. We dismiss Spears and Eliades's petition for a writ of mandamus as moot.

*So ordered.*