# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 11, 2021          Decided April 9, 2021

No. 19-1212

IN RE: NASHWAN AL-TAMIR,
PETITIONER

———

On Petition For A Writ of Mandamus and Prohibition

———

*Meghan S. Skelton*, Senior Litigation Attorney, Office of Military Commissions Defense Organization, argued the cause for petitioner. With her on the petition were *Maj. Morgan N. Engling* and *LCDR Jacob E. Meusch*, Attorneys.

*Danielle S. Tarin*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the opposition was *Joseph F. Palmer*, Attorney.

Before: SRINIVASAN, *Chief Judge*, TATEL and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: For the second time, we face the question of what to do about a Guantanamo military commission judge who, while presiding, seeks employment with an entity involved in prosecuting the detainee. That now unfortunately familiar quandary is accompanied in this case by two new ones: the adequacy of the government's offer to

reconsider de novo any commission orders the detainee requests, and the ethical consequences of an attorney advisor's search for outside employment while assisting the judges presiding over the detainee's commission. In a petition for a writ of mandamus, the detainee urges us to dissolve the commission. But because the government's offer affords petitioner an "adequate means" to attain the relief he seeks and because the advisor's job search did not "clear[ly] and indisputabl[y]" disqualify the judges he served, we deny the petition. *In re Al-Nashiri* (*Al-Nashiri III*), 921 F.3d 224, 233 (D.C. Cir. 2019) (internal quotation marks omitted).

## I.

Our court has repeatedly described the structure of the Guantanamo Bay military commissions, which "is the product of an extended dialogue among the President, the Congress and the Supreme Court." *In re al-Nashiri* (*al-Nashiri I*), 791 F.3d 71, 73 (D.C. Cir. 2015). For purposes of this case, readers need understand only a few key features.

The Military Commissions Act of 2006 (MCA) establishes a system "based upon the procedures for trial by general courts-martial under [the Uniform Code of Military Justice]." 10 U.S.C. § 948b(c). The revised MCA provides that a convening authority—either the Secretary of Defense or an officer or official designated by the Secretary—may convene a military commission. *Id.* § 948h. A military judge presides over commission proceedings, *id.* § 948j(a), with assistance from civilian and military attorneys working as attorney advisors.

Importantly for the issues before us, the Defense Department is not the only agency with a substantial role in the military commission system. Although the "MCA gives the Secretary of Defense, not the Attorney General, authority to convene military commissions, . . . the Attorney General plays

an important institutional role in military commissions more generally." *Al-Nashiri III*, 921 F.3d at 236. The MCA provides that "'the Secretary of Defense, in consultation with the Attorney General' [shall] establish rules for 'trials by military commission'" and that "appellate counsel appointed by the Secretary of Defense [may] 'represent the United States' in appeals beyond the [Court of Military Commission Review] only if 'requested to do so by the Attorney General.'" *Id.* (quoting 10 U.S.C. §§ 949a(b)(1), 950h(b)(2)). And the regulations governing military commissions "contemplate[] that the Attorney General will detail Justice Department lawyers to commission proceedings with some regularity." *Id.* We have therefore described the Attorney General as "a participant" in a military commission case where he "consult[s] on commission trial procedures" and may "play a role in defending any conviction on appeal." *Id.* And where the Attorney General "has loaned out one of his lawyers," he is "a participant" in yet another respect. *Id.*

Ordinarily, a defendant may have a final guilty finding reviewed by the U.S. Court of Military Commission Review (CMCR). *See In re Al-Nashiri* (*Al-Nashiri II*), 835 F.3d 110, 122 (D.C. Cir. 2016) (citing 10 U.S.C. §§ 950f, 950c). A defendant may also obtain review in this court after all proceedings in the military courts have concluded. *See* 10 U.S.C. § 950g(a)–(b). And, where appropriate, a defendant may seek a writ of mandamus prior to a final judgment. That is the situation here, as it was in *Al-Nashiri III*, where we vacated all orders a military commission judge issued after the date of his application for employment as an immigration judge with the U.S. Department of Justice.

Petitioner Nashwan al-Tamir was apprehended in Turkey in October 2006. Petitioner's Br. 5. According to al-Tamir, he was then "moved to a CIA black site where the United States

held him incommunicado and tortured him for approximately six months." *Id.* The government then transferred him to the U.S. Naval base at Guantanamo Bay, where it held him for seven years without charges. *Id.* On June 2, 2014, a military commission was convened to try al-Tamir for war crimes and for conspiring to commit offenses under the MCA. In particular, he is alleged to have conspired with Usama bin Laden and other Al-Qaeda leaders to conduct terrorist attacks in Afghanistan, Pakistan, and elsewhere. Because al-Tamir was charged under the name of Abd al Hadi al-Iraqi, the commission is referred to as the "*Hadi* commission."

Navy Captain Kirk Waits presided over al-Tamir's commission for nearly two and a half years, from June 2014 to October 2016. At the outset, the Attorney General detailed an Assistant U.S. Attorney from DOJ's National Security Division as the lead prosecutor. Judge Waits arraigned al-Tamir on June 18, 2014, during a thirty-three-minute hearing in which the DOJ prosecutor was the first attorney to speak on the record. Less than two months later, prior to any other hearings or substantive orders, Waits applied to be an immigration judge in DOJ's Executive Office of Immigration Review. In his applications for positions in eleven different cities, he stated that he was the only Navy or Marine Corps judge detailed to a military commission and identified the *Hadi* commission by name. Those applications remained under consideration for the entire first year of proceedings, but Waits received no interviews or offers.

In April 2016, while still presiding over the *Hadi* commission, Judge Waits applied to be the Deputy Director of the Navy Office of the Judge Advocate General Criminal Law Division within the Department of Defense. Again, his application highlighted his role in the *Hadi* commission. He interviewed around May 2016 and received a job offer later that

year. He accepted and began his new role in January 2017. Over two years later, after our court's 2019 decision in *Al-Nashiri III* that a military judge's application for an immigration judge position created an appearance of bias requiring recusal, 921 F.3d at 236–37, Judge Waits contacted the trial judiciary to disclose his employment applications to al-Tamir and the military commission.

After Judge Waits resigned, two other judges served on al-Tamir's commission. Marine Corps Colonel Peter Rubin presided from November 2016 to June 2018, and Marine Corps Lieutenant Colonel Michael Libretto presided from June 2018 to January 2020. In January 2020, Judge Libretto recused himself, citing his intent to retire from the military and his search for post-retirement employment.

Matthew Blackwood served as a civilian Supervisory Attorney Advisor for all three judges and began applying for outside employment while assisting Judge Rubin. We describe his role and job search in Section II where we consider whether his conduct provides al-Tamir a separate basis for relief.

Following our decision in *Al-Nashiri III* and Judge Waits's subsequent disclosures, al-Tamir submitted two motions to Judge Libretto. First, based on Judge Waits's and Matthew Blackwood's job applications, he moved to dismiss all charges against him. Second, based on Blackwood's continued assistance after submitting outside employment applications, al-Tamir moved to disqualify Judge Libretto.

Responding to the first motion, Judge Libretto agreed that Judge Waits should have recused himself but declined to dismiss the charges against al-Tamir. Instead, Judge Libretto declared that he would reconsider de novo any of Judge Waits's decisions that al-Tamir identifies, while leaving intact any rulings al-Tamir prefers not to have reconsidered. Judge

Libretto subsequently denied the second motion, ruling that neither Blackwood's applications nor his acceptance of employment disqualified the judges he assisted.

Al-Tamir then sought mandamus relief in the CMCR and, while that petition was pending, the same relief here. We held al-Tamir's petition in abeyance pending the CMCR's decision. Per Curiam Order, *In re al-Tamir*, No. 19-1212 (Nov. 6, 2019). The CMCR denied al-Tamir's petition, agreeing with Judge Libretto that, while Judge Waits ought to have recused himself, de novo reconsideration of his orders would "adequately address[] the goal of securing proceedings free from the appearance of bias." *Al-Iraqi v. United States*, 455 F. Supp. 3d 1273, 1316 (CMCR 2020). The CMCR remanded for the commission to implement that reconsideration remedy. *Id.* at 1354. Following the CMCR's decision, briefing and oral argument proceeded here.

At oral argument, government counsel offered an important clarification: the government's proposed remedy extends to any orders issued by either Judges Rubin or Libretto that al-Tamir identifies as influenced by Judge Waits's decisions. Counsel explained that to have particular post-Waits orders reconsidered de novo, al-Tamir need only "list the . . . orders that he believes are affected" by the earlier decision. Oral Arg. Tr. 24. Pressed on whether al-Tamir would have to make any threshold showing that a later decision was influenced by a prior Waits order, counsel made clear that no such showing was required—al-Tamir "would just have to identify that order." *Id.* at 26. In other words, he need only "identify an order as having been affected by a prior order issued by Judge Waits. That's it." *Id.* at 27.

## II.

The MCA imposes a stringent final judgment rule on our court. We have "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission," but not "until all other appeals . . . have been waived or exhausted." 10 U.S.C. § 950g(a), (b). Mandamus provides an exception to the final judgment rule, and we may therefore "issue a writ of mandamus *now* to protect the exercise of our appellate jurisdiction *later*." *Al-Nashiri III*, 921 F.3d at 233 (internal quotation marks omitted).

Mandamus, we have explained, "provides an appropriate vehicle for seeking recusal of a judicial officer during the pendency of a case, as ordinary appellate review following a final judgment is insufficient to remove the insidious taint of judicial bias." *Id.* at 233 (internal quotation marks omitted). So too when "the disqualified adjudicator is gone but his orders remain." *Id.* at 238. That said, we have also stressed that the MCA's final judgment rule serves an "important purpose," and that we must therefore "faithfully enforce the traditional prerequisites for mandamus relief." *Id.* at 233 (internal quotation marks omitted).

"[M]andamus is a drastic remedy, to be invoked only in extraordinary circumstances." *Id.* at 237 (internal quotation marks omitted). "For a court to grant a writ of mandamus, three conditions must be met." *Id.* at 233. First, "the petitioner must demonstrate that [his] right to issuance of the writ is clear and indisputable." *Id.* (alteration in original) (internal quotation marks omitted). Second, "the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires." *Id.* (alteration in original) (internal quotation marks omitted). Third, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* (internal quotation marks omitted).

Pursuant to that framework, we consider whether Judge Waits's conduct justifies mandamus relief and then whether Blackwood's conduct justifies such relief.

## Judge Waits

In *Al-Nashiri III*, we concluded that a military judge was operating under a disqualifying conflict of interest because, while presiding over a military commission, he actively sought employment as an immigration judge with DOJ's Executive Office of Immigration Review. We granted mandamus, vacating all the judge's orders issued after the date his conflict arose.

In this case, the government agrees that, under the principles set forth in *Al-Nashiri III*, "Judge Waits should have recused himself when he applied for an immigration judge position." Respondent's Br. 20. The issue now is what to do about Judge Waits's failure to do so. The government argues that its reconsideration remedy affords al-Tamir adequate relief and that he therefore cannot satisfy the second mandamus requirement. Al-Tamir disagrees, urging us to dissolve the entire commission.

We agree with the government that its de novo reconsideration remedy is "substantially similar" to the remedy ordered in *Al-Nashiri III*, except that it affords al-Tamir the added benefit of allowing him to retain favorable rulings. Respondent's Br. 32. Al-Tamir thus may "scrub the case of judicial bias," *Al-Nashiri III*, 921 F.3d at 240, by selecting any order issued or influenced by Judge Waits to be fully reconsidered by a new, impartial judge—indeed, he could request reconsideration of all Judge Waits's orders if he so chose. That seems to us a more than "adequate means to attain the relief he desires," *Al-Nashiri III*, 921 F.3d at 233, given that the government may not resist or decline his requests.

Al-Tamir offers several arguments for why that alternative remedy is nonetheless inadequate. We are unpersuaded.

To begin with, several of the shortcomings al-Tamir associates with reconsideration apply equally to the remedy we adopted in *Al-Nashiri III*. For instance, al-Tamir argues that reconsideration "overlooks the invisible ways in which the appearance of bias infects a proceeding," Petitioner's Br. 66, and that it cannot address "issues where Waits failed to rule," *id.*, or decisions that do "not even appear on the record," *id.* at 72. But vacating the judge's orders in *Al-Nashiri III* was equally incapable of undoing decisions unreflected in discrete judicial orders. That we nonetheless adopted that remedy in lieu of more "draconian" options—like dissolving the commission—makes clear that such limitations do not doom the government's proposed remedy here. *Al-Nashiri III*, 921 F.3d at 240 (internal quotation marks omitted).

Al-Tamir analogizes de novo reconsideration to the one remedy we did reject in *Al Nashiri III*, post-conviction appellate review. There, we found such review to be inadequate because "no amount of appellate review can remove completely the stain of judicial bias, both because it is too difficult to detect all of the ways that bias can influence a proceeding and because public confidence . . . is irreparably dampened once a case is allowed to proceed before a judge who appears to be tainted." *Id.* at 238 (alteration in original) (internal quotation marks omitted). We went on to emphasize that the "same is true for proceedings in which the disqualified adjudicator is gone but his orders remain." *Id.* "If a judge should have been recused from the . . . proceedings, then any work produced by that judge must also be . . . suppressed." *Id.* (first alteration in original) (internal quotation marks omitted). Al-Nashiri therefore had "no adequate remedy for [the judge's]

conduct other than to scrub [the judge's] orders from the case at the earliest opportunity." *Id.*

According to al-Tamir, that discussion of post-conviction appellate review's deficiencies applies equally to the government's proposed remedy here. But that argument overlooks two key differences between appellate review and de novo reconsideration.

First, unlike in al-Nashiri's situation, neither al-Tamir nor public confidence in the commission system is threatened with the irreparable harm of continuing a proceeding infected with bias because, under the government's proposed remedy, de novo reconsideration will occur *prior* to further commission proceedings, including trial. Second, post-conviction appellate review involves varying standards of review, some requiring substantial deference to the commission. *See, e.g.*, *Al Bahlul v. United States*, 767 F.3d 1, 8–10 (D.C. Cir. 2014) (explaining that errors forfeited before the commission are reviewed for plain error). Of course, a decision motivated by bias would be impermissible under any such standard. But as we emphasized in *Al-Nashiri III*, it is "difficult to detect all of the ways that bias can influence a proceeding," thus limiting post-conviction review's remedial potential. *Al-Nashiri III*, 921 F.3d at 238. In this case, by contrast, there is no need to ferret out the clandestine influence of bias, as the commission's review will be de novo.

Al-Tamir next argues that de novo reconsideration is inadequate because it "would address only written rulings." Petitioner's Br. 66. But he identifies no source for such a limitation. Quite to the contrary, Judge Libretto's reconsideration order encompasses oral rulings by referring to "*any* rulings and orders issued by Judge Waits specifically identified by the Defense as warranting review." Ruling AE

158R at 21, *United States v. Abd al Hadi al-Iraqi* (Military Commissions Trial Judiciary 2019), Appendix (App.) 116 (emphasis added). At oral argument, al-Tamir's counsel was concerned that the government has asked her client to provide "AE numbers" for orders he wants reconsidered—identifiers that do not exist for oral rulings. Oral Arg. Tr. 13–14. But such a requirement appears nowhere in Judge Libretto's order and would be inconsistent both with that order and with the scope of relief government counsel has represented is available to al-Tamir.

Next, al-Tamir contends that de novo reconsideration of only Judge Waits's orders is insufficient to scrub the commission of bias because those orders impacted subsequent commission proceedings under Judges Rubin and Libretto. That might have been a powerful argument but for government counsel's clear statements at oral argument committing the new commission judge to reviewing de novo *any* later ruling al-Tamir identifies as influenced by Judge Waits's decisions. Given that al-Tamir need not make any showing that a later order was in fact influenced by Judge Waits's decisions, or even reasonably likely to have been so influenced, that approach fully resolves his concerns. Indeed, as explained above, government counsel clarified at oral argument that al-Tamir "would just have to identify" those orders he would like reconsidered for the new judge to do so. Oral Arg. Tr. 26.

Finally, al-Tamir correctly points out that in one respect the case for dissolving the commission is stronger here than in *Al-Nashiri III*. There, unlike here, the commission had proceeded for years before a disqualifying conflict emerged. Although we "[r]ecogniz[ed] the powerful case for dissolving the . . . military commission entirely," we instead concluded that "a writ of mandamus directing vacatur of all orders entered by [the judge] after . . . the date of his application[ would]

sufficiently scrub the case of judicial bias without imposing an unnecessarily draconian remedy." *Al-Nashiri III*, 921 F.3d at 240. Although the disqualifying conflict in this case arose far earlier in the proceedings, we are convinced for the reasons described above that the government's de novo reconsideration remedy, rather than a more "draconian" approach, suffices to "scrub the case of judicial bias."

In sum, al-Tamir has, at least with respect to Judge Waits's conflict, an adequate alternative remedy to mandamus. Judge Waits's conduct thus does not entitle al-Tamir to issuance of the writ, leaving us with no need to consider the remaining mandamus factors.

## Blackwood

Recall that Matthew Blackwood served as an attorney advisor to all three commission judges and began applying for outside employment while assisting Judge Rubin. Unlike in the case of Judge Waits, the government does not concede that Blackwood's applications or eventual acceptance of employment as an Assistant U.S. Attorney created a basis for recusal of the judges he served. Accordingly, it has committed only to reconsidering any orders al-Tamir believes were affected by Judge Waits's orders or actions. Al-Tamir, however, argues that Judges Rubin and Libretto operated under a second source of bias, namely, Blackwood's employment search. It is to that dispute that we now turn.

Blackwood's official position description explains that he was a "senior, highly experienced" attorney assisting and advising military commission judges as a "subject matter expert attorney with expertise in criminal trial practice in the context of the Military Commissions." Position Description, App. 797. His duties included overseeing legal research, consulting with experts, reviewing national and international

military commission practices, preparing recommendations, and "drafting . . . opinions, rulings and orders." *Id.*, App. 798. The judges relied on him to prepare and deliver "oral presentations such as briefings, training sessions, consultations, and strategy sessions" and to "resolve controversial matters." *Id.*, App. 798. He also supervised the court information security officer, whose job was to "govern[] the creation, protection, safeguarding, transmission, and destruction of classified material." *Id.*, App. 798. Blackwood met with the *Hadi* prosecutors ex parte around five or six times pursuant to Military Commission Rule of Evidence 505, which allows for such meetings to review and approve government-proposed substitutions for classified evidence. Blackwood exercised substantial discretion in those meetings. *See* Petitioner's Br. 15–16.

In late 2017 or early 2018, while commission proceedings were ongoing, Blackwood began looking for a new job. Judge Rubin, the commission judge at the time, had no recollection of Blackwood informing him about the job search. In January 2018, Blackwood applied for a job with DOJ's National Security Division, the same division that employed the first prosecutor in al-Tamir's commission. Like Waits, Blackwood highlighted his work on al-Tamir's commission in his application. He also provided as a writing sample a copy of a *Hadi* commission ruling with certain identifying information omitted. Over the next few months, Blackwood applied for many other roles with DOJ and DOD, including with law enforcement agencies that had participated in al-Tamir's interrogation. He also applied to be a prosecutor in numerous United States Attorney's Offices, interviewing for at least six AUSA positions. In July 2018, Blackwood was offered and declined a job as an AUSA in the Western District of Texas.

On July 31, Blackwood applied to be an AUSA specializing in terrorism and national security in the Western District of Missouri. He again highlighted in his application his experience on the *Hadi* commission and mentioned his commission work during his interview with an attorney who had worked on the "privilege filter team" in *Al-Nashiri*. Blackwood received a tentative job offer to be a national security prosecutor on August 31 and accepted the same day. Within a month, Blackwood told Judge Libretto about the offer but nonetheless continued to work on the commission without any change in duties. That work included reviewing sealed materials to which Judge Libretto lacked access from his duty station.

The government argues that an attorney advisor like Blackwood is best understood as a more professionally advanced variety of law clerk. Though al-Tamir emphasizes that Blackwood took on a more substantial and sensitive role than would the typical judicial law clerk, he offers no closer analogue. In any event, Blackwood's core responsibilities— overseeing legal research and drafting opinions, rulings, and orders—were substantially similar to those of many law clerks, and law clerks themselves may take on widely varying levels of responsibility depending on the preferences of their judges.

As a general matter, law clerks are subject to ethical duties similar to their judges'. *See In re Allied-Signal Inc.*, 891 F.2d 967, 970 (1st Cir. 1989) ("[T]he relationship of clerk to judge itself is close enough that one might find an appearance of undue influence."); *Hall v. Small Business Administration*, 695 F.2d 175, 179 (5th Cir. 1983) ("[T]he clerk is forbidden to do all that is prohibited to the judge."); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1525 (11th Cir. 1988) ("We recognize the importance that some law clerks play in the decisional process and it is for this reason that a clerk is forbidden to do all that is

prohibited to the Judge." (internal quotation marks omitted)). But as "[b]oth bench and bar recognize[,] . . . judges, not law clerks, make the decisions," *In re Allied-Signal Inc.*, 891 F.2d at 971, and clerks therefore are not subject to precisely the same ethical requirements as their judges.

A law clerk's ethical responsibilities with respect to future employment are ordinarily triggered only once that clerk receives or accepts a job offer. That is the position taken by the federal judiciary's standards for federal law clerks: "Ask your judge if you may apply for a job with a firm that represents a party currently before the court. If you interviewed with a firm but have not accepted an offer, your judge has discretion about whether you may work on matters involving the firm. Once you have accepted an offer, . . . [y]ou may not work on any pending or future cases involving your future employer." Federal Judicial Center, *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* 25–26 (rev. 4th ed. 2019). Our sister circuits, as well as the D.C. courts, have echoed that view. *See, e.g.*, *Hall*, 695 F.2d at 176–77 ("Because a magistrate's sole law clerk was initially a member of the plaintiff class in this suit, had before her employment with the magistrate expressed herself as convinced of the correctness of its contentions, and accepted employment with its counsel before judgment was rendered, we hold that the magistrate erred in refusing to disqualify himself."); *First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 988 (9th Cir. 2000) ("It is expected that when a clerk has accepted a position with an attorney or with a firm, that clerk should cease further involvement in those cases in which the future employer has an interest." (internal quotation marks omitted)); Advisory Committee on Judicial Conduct of the District of Columbia Courts, Advisory Opinion 1 (1991) ("No obligation to notify the judge or to take other precautionary measures arises merely because the law clerk has submitted an

application for employment . . . . The clerk's obligation to inform the judge of the identity of a prospective employer arises when that prospective employer notifies the clerk that the clerk has been invited to an employment interview, or has been offered a position without an interview being required . . . .").

Al-Tamir has identified no case in which a court has found a recusal obligation to arise upon a clerk's application for employment, rather than upon the receipt or acceptance of an employment offer. Although it is equally true that no case squarely forecloses the possibility of such an obligation and that Blackwood's responsibilities exceeded those of most law clerks, the standard for mandamus relief is demanding, and given the absence of clear authority for al-Tamir's position, we cannot say that his "right to issuance of the writ is clear and indisputable." *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 381 (2004) (internal quotation marks omitted).

That said, Blackwood continued to work on the commission for several months after receiving and accepting an employment offer. We nonetheless agree with the government that his acceptance provides no basis for recusal.

We held that recusal was required in *Al-Nashiri III* because of the Attorney General's key role in overseeing both military commission prosecutions and immigration judges. True, the Executive Office of Immigration Review was not a party to al-Nashiri's commission. But the Attorney General's role within that office meant that the office and the prosecution were linked in a meaningful fashion. The Attorney General, we explained, was properly understood as a participant in al-Nashiri's commission for two reasons. First, "the Justice Department, presumably with the approval of the Attorney General, detailed one of its lawyers to prosecute Al-Nashiri." *Al-Nashiri III*, 921

F.3d at 236. Second, "aside from the particulars of Al-Nashiri's case, the Attorney General plays an important institutional role in military commissions." *Id.* As for the Executive Office of Immigration Review, we recognized that "although the Justice Department is a complex institution with many offices performing many different functions," the Attorney General was an immigration judge's employer because he was "directly involved in selecting and supervising immigration judges." *Id.* at 235. In reaching that conclusion, we distinguished the Attorney General's direct role in appointing immigration judges from, for instance, the hiring process for administrative law judges, "who are hired through a selection process administered by the Office of Personnel Management." *Id.*

Blackwood's new job—as an AUSA with the U.S. Attorney's Office for the Western District of Missouri—was different. Although there is no doubt that the Attorney General serves the same role in the prosecution here as he did in *Al-Nashiri III*, it is far less clear that an AUSA like Blackwood is employed by the Attorney General in the same sense as is an immigration judge. The government argues that the two roles differ because, as it explained in its interrogatory responses, the "Attorney General is not personally involved in the selection or approval of individual AUSAs." Responses to Interrogatories Propounded in AE 160H at 2, *United States v. Abd al Hadi al-Iraqi*, App. 925. AUSAs are, as the government explained, instead recruited and evaluated by individual U.S. Attorney's Offices and then subjected to a limited approval process by the Executive Office for the United States Attorneys and the Office of Attorney Recruitment and Management. *Id.* at 1–2, App. 924–25. Taking the opposite position, al-Tamir points out that the relevant statute provides that "[t]he Attorney General may appoint one or more assistant United States attorneys in any district when the public interest so requires" and that "[e]ach assistant United States attorney is subject to

removal by the Attorney General." 28 U.S.C. § 542. The Attorney General, however, has by regulation delegated authority to appoint and employ AUSAs to the Deputy Attorney General, who has in turn further delegated authority to appoint AUSAs to the Director of the Office of Attorney Recruitment and Management. 28 C.F.R. § 0.15(b)(1)(v); U.S. Department of Justice, Justice Manual, § 3-4.300(A) (2018).

We need not definitively resolve whether the Attorney General should be considered AUSAs' employer for recusal purposes to conclude that the answer is at least uncertain enough to make al-Tamir's right to relief far from "clear and indisputable." Given that the Attorney General does not in practice select AUSAs and has no statutory or practical role in supervising their conduct, it is at the very least highly uncertain whether the Attorney General is properly considered Blackwood's employer.

Al-Tamir insists that the Western District of Missouri is unique among local U.S. Attorneys' Offices because the Deputy U.S. Attorney—the chief of the criminal section within that office—was previously on loan to the Department of Defense to aid in the prosecution of al-Nashiri. But again, al-Tamir has identified no source of law or ethical guidelines speaking to that situation or a closely analogous one.

Although we have some concerns about Blackwood's failure to disclose to his supervising judges his pursuit of outside employment and his use of his work on the commission in his applications, we cannot say that his choices "clearly and indisputably" gave rise to a conflict warranting recusal. Given that conclusion, we need not consider the separate question whether Blackwood's purported conflict would be imputed to the judges he served.

**III.**

For the foregoing reasons, the petition is denied.

*So ordered.*