*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
STEPHENS, HOUTZ, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Roberto ARMENDARIZ**
Master Sergeant (E-8), U.S. Marine Corps
*Appellant*

**No. 201700338 (f rev)**

_____

Decided: 24 June 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary
*upon further review following remand from*
*the United States Court of Appeals for the Armed Forces*

Military Judges:
Matthew J. Kent (arraignment)
Brian E. Kasprzyk (motions)
Mark D. Sameit (trial)

Sentence adjudged 24 July 2017 by a general court-martial convened at
Marine Corps Air Station Miramar, California, consisting of members
with enlisted representation. Sentence approved by the convening au-
thority: confinement for 18 months, and a dishonorable discharge.

For Appellant:
*Tami L. Mitchell, Esq.*
*Major Mary Claire Finnen, USMC*

For Appellee:
*Lieutenant Gregory A. Rustico, JAGC, USN*
*Lieutenant John L. Flynn IV, JAGC, USN*

Senior Judge STEPHENS delivered the Opinion of the Court, in which Judge HOUTZ joined. Judge DEERWESTER filed a separate opinion dissenting in part.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

STEPHENS, Senior Judge:

This sexual assault case is before us a second time. In 2019, we found legal error when Appellant's squadron executive officer [XO] approved a search authorization.[1] The Judge Advocate General of the Navy certified that issue to the Court of Appeals for the Armed Forces [CAAF], where our decision was reversed and the case was remanded.[2] CAAF affirmed one of Appellant's findings of guilt for violating a general order by fraternizing—a finding we affirmed—because the search produced no evidence pertinent to that specification. We now review Appellant's findings of guilt of two specifications for violating a lawful general order,[3] one specification of sexual assault by bodily harm, one specification of abusive sexual contact by bodily harm, and one specification of adultery in violation of Articles 92, 120, and 134, Uniform Code of Military Justice [UCMJ].[4]

Appellant raises 11 assignments of error [AOEs], which we have reordered as follows: (1) the evidence was factually and legally insufficient; (2) one of the presiding military judges had a conflict of interest; (3) the military judge abused his discretion by denying a defense motion to suppress evidence seized from Appellant's body, phones, vehicle, and wall locker; (4) Appellant's trial

———————————

[1] *United States v. Armendariz*, 79 M.J. 535 (N-M. Ct. Crim. App. 2019) (*Armendariz I*).

[2] *United States v. Armendariz*, 80 M.J. 130 (C.A.A.F. 2020) (*Armendariz II*).

[3] Owing to newly discovered evidence in this case, we separately issue a writ of error coram nobis and again review one of the specifications for violating a lawful general order (fraternization) that we had previously affirmed.

[4] 10 U.S.C. §§ 892, 920, 934 (2012).

defense counsel [TDC] was ineffective; (5) the military judge abused his discretion in granting the Government's Military Rule of Evidence [M.R.E.] 412 motion; (6) the military judge erred in allowing trial counsel to argue to the members that Appellant made a "false exculpatory" statement; (7) the military judge abused his discretion when he declined to give the members an adverse inference instruction for the complaining witness' refusal to provide her cell phone or for the Government's decision not to obtain a search authorization for her phone; (8) the trial counsel engaged in improper argument by speculating that a member's question indicated the member already believed Appellant was guilty; (9) the military judge abused his discretion in denying Appellant's M.R.E. 412 motion as untimely; (10) non-unanimous courts-martial verdicts are unconstitutional under *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020);[5] and (11) the cumulative impact of the alleged errors undermined the fairness of Appellant's trial.[6]

We find merit in Appellant's first AOE pertaining to the sexual assault, abusive sexual contact, and adultery specifications. We take action in our decretal paragraph. But we also find merit in Appellant's second AOE concerning the appearance of bias on the part of the military judge. Because this prejudicial error affects the remaining specifications for violating a lawful general regulation and the previously-affirmed specification for the orders violation for fraternization, we remand for a new trial, absent the specifications that were found factually insufficient.

## I. BACKGROUND

### A. Appellant and Sergeant November Reconnect

In the summer of 2016, Appellant was a Master Sergeant (E-8) assigned to Marine Wing Support Squadron 373 [MWSS-373] at Marine Corps Air Station Miramar, California, with about 27 years in the Marine Corps. He had served and deployed with Sergeant (E-5) [Sgt] November[7] at MWSS-373 from 2010 to 2013 when she was a junior Marine. Since then, she had been assigned to duty

---

[5] We decline to discuss this AOE. *See United States v. Causey*, __ M.J. __, No. 202000228, 2022 CCA LEXIS 176, (N-M. Ct. Crim. App. Mar. 23, 2022) (declining to extend the holding in *Ramos* to courts-martial); *United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

[6] We decline to review Appellant's third through ninth and eleventh AOEs, as our resolution of AOEs I and II makes them moot.

[7] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

in Quantico, Virginia, and in Japan, and was now returning to MWSS-373. When she checked in, she was a Sergeant who was just a few months away from being promoted to Staff Sergeant (E-6) and had served about seven years in the Marine Corps. The two had not been in touch in the interim, but they had a shared history. In 2012, despite Appellant having been far senior to her in rank, and Sgt November being at her first Fleet Marine Force duty station, they had a one-time sexual encounter. But now, Appellant was the acting sergeant major of MWSS-373 and Sgt November had a son whose father was a retired Marine (Appellant had tried to assist Sgt November with child support issues with the father), and she had a Marine boyfriend who was stationed in Virginia. Appellant was still married, just as he had been years ago when he and Sgt November had sex.

Sgt November did not know Appellant was at MWSS-373 or that he was the acting sergeant major until she arrived at the command. When she discovered this, the two re-connected. The two texted back and forth intermittently about various work and personal matters, such as running together, personnel issues, and the shipment of her household goods from Japan.

## B. Sergeant November Comes to Appellant's Office

After about two weeks of being at MWSS-373, Sgt November texted Appellant one Monday morning at 0715.

Sgt November:     Are you alive?!

Appellant:             lol

                            What you doing

Sgt November:     Lol just got into work. I haven't seen you in like a week[8]

In response, Sgt November called Appellant, who by then was no longer the acting squadron sergeant major. Sgt November's work building was near Building 6018, where Appellant and other Marines worked. She wanted to come by his office so he could help her roll up the sleeves on the blouse of her utility uniform. Sgt November had been to the drill instructor course (though she had never served as one) where she had altered her sleeves, as many Marine Corps drill instructors do. Appellant, a former drill instructor, agreed to help her because Sgt November joked that she was too "lazy" to do it.[9]

Sgt November arrived at Building 6018 at around 0800. That building contained a few interior offices and a large common area with a conference room

---

[8] Pros. Ex. 11.

[9] R. at 493.

table. Each Monday, there was an airfield operations meeting at the common area conference room table with several staff noncommissioned officers and chief warrant officers in attendance. The meeting usually started around 0800 and would last about 30 minutes. Appellant did not usually attend, but had been expected by one of the chief warrant officers to attend that day's meeting.

When Sgt November arrived, she parked in front of the building. Appellant met her outside because she had never been to this particular office. She wore civilian running shorts and her green uniform t-shirt. She carried her boots, utility trousers and blouse, but not her utility cover. Appellant was wearing civilian exercise shorts and a shirt. When they went into the building, they walked past the meeting that was just about to start and they went into Appellant's office. The interior office was not large and it had no windows. It contained a desk, a small couch up against the wall near the door, and a wall locker. Testimony was divided about whether the office door was either shut or slightly cracked open. The time was just after 0805.

The airfield operations meeting lasted from about 0805 to about 0830. No one attending the meeting ever saw or heard anything unusual or suspicious coming from Appellant's office. After the airfield operations meeting, two of the attendees, both gunnery sergeants, were in the office adjacent to Appellant's. Neither reported hearing anything unusual through the thin shared wall. One of the Marines, Gunnery Sergeant (E-7) Mike went into Appellant's office. He saw Sgt November standing wearing her utility uniform and Appellant seated at his desk. He thought he had interrupted a work meeting and asked, "How are you guys doing?" and Appellant and Sgt November told him, "Fine."[10] They had a regular conversation which lasted only "minutes."[11] The other gunnery sergeant—whose office was next door—recalled just hearing "voices . . . [and could not] really make out what they were saying. . . just casual talk" coming through the walls.[12] He also saw Sgt November walk past the door of his office "real quick" sometime after the meeting ended.[13] He did not observe that she was distraught or distressed.

From Sgt November's cellphone records,[14] we know that about eight minutes after she entered the building, she sent a text to her Marine boyfriend

---

[10] R. at 578.

[11] R. at 447.

[12] R. at 453.

[13] *Id.*

[14] Pros. Ex. 12.

in Virginia. And 15 minutes later, he responded, to which she, in turn, responded two minutes later. Seven minutes after that, she sent a text to her cousin. Eight minutes later, her boyfriend texted her again, to which she immediately responded, as did he. Two minutes later, she sent him another text, and he again immediately responded. There is no record of the substance of these messages and the records only include messages transmitted using cellular, rather than wireless internet, means. However, the records show intervals of 8, 15, 7, 8, 2, and then 6 minutes where she was not using her phone to send text messages for the duration of her time inside the building.

After she left the building, she returned briefly. Having left her cover in her car, she borrowed Appellant's cover to exit the building in her uniform to retrieve her own cover. She re-entered the building to return Appellant's cover and then left. Presumably this is when the other gunnery sergeant saw her quickly walk past his office door. It was then, at 0855—about 50 minutes after she first entered the building—that she made a 44 second phone call to her boyfriend and went to work. Also, just as she left the building, at 0854, Appellant sent her a text message asking, "What are you doing later" that went unanswered for several hours.[15]

## C. Appellant Makes a Sexual Assault Complaint

After Sgt November had been at work for just over an hour, she went to the bathroom because she felt "embarrassed" and "dirty" about what happened when she was in Appellant's office.[16] She later told the Naval Criminal Investigative Service [NCIS] that when she went to the bathroom, she had a "little bit of blood in [her] underwear" and started to believe that what happened was "definitely wrong."[17] She then got into her car and drove to the parking lot of the base theater and made some phone calls.

She called her boyfriend at 0954 and again at 1039. Each of the calls lasted around half a minute. At 1042, she made a call to her parents lasting about two minutes. Just after that, she made two more calls to her boyfriend lasting a minute each. At 1115, she responded to Appellant's earlier text message asking what she was doing later. She texted, "Not hanging around you," to which Appellant immediately responded, "Lol."[18]

---

[15] Pros. Ex. 11.

[16] R. at 477.

[17] *Id*.

[18] Pros. Ex. 11.

Finally, at 1136 she called First Sergeant (E-8) [1stSgt] Lima, who was stationed at Camp Pendleton. She knew him from prior service—and had a close personal relationship with him—and she told him Appellant had sexually assaulted her in his office. 1stSgt Lima was the first person to whom she told this, and she asked him not to tell anyone. He told her that he was a mandatory reporter and he placed her on hold while he called military law enforcement.

Around 1200, Sgt November was escorted by military police to the NCIS field office. During her two-hour interview, she was "crying" and "visibly upset."[19] After the interview, Sgt November went with her victim advocate and the NCIS agent who interviewed her to a nearby civilian hospital for a Sexual Assault Forensic Exam [SAFE]. Before leaving for the exam, the NCIS agent instructed other agents to take steps to obtain a command search authorization for Appellant's office, person, car, and cellphone.

Soon after the NCIS interview concluded, Appellant texted Sgt November again. He asked her, "Did you pick up your baby," referring to childcare issues with her young son.[20] Sgt November did not respond.

Sgt November arrived at the hospital around 1515. A sexual assault nurse examiner performed a SAFE on her. The nurse took pictures of her and collected blood and urine samples, fingernail scrapings, and buccal swabs. She also performed a vaginal exam where she used dye and a speculum to search for injuries. She then made a report complete with a diagram indicating the fresh injuries she discovered, which were abrasions to her inner vaginal lips. The nurse later testified that these could be consistent with either nonconsensual or consensual penetration and that nothing definitively indicated that any penetration was caused by a penis or a finger. No other injuries were discovered during the exam.

After the SAFE, the NCIS agent took Sgt November back to the NCIS field office. When the agent asked for the shorts she was wearing that morning, Sgt November provided them. The NCIS agent did not ask her for her cellphone.

## D. Appellant is Investigated and Prosecuted at General Court-Martial

### 1. The NCIS investigation

NCIS immediately investigated Appellant. Around 1400, the MWSS-373 XO ordered Appellant to return to work (he had gone home already), but did not tell him why. The chief warrant officer—Appellant's Officer in Charge

---

[19] R. at 338.

[20] Pros. Ex. 11.

7

[OIC]— who ran the airfield operations meeting that morning, also communicated with Appellant to order him to return to base, but did not tell him why. The XO signed a command search authorization for evidentiary items pertaining to Appellant.

That afternoon, several NCIS agents went to Appellant's office when he was not there. They took photographs of the office and the common area outside the office, seized two pairs of Appellant's shorts, two pairs of his underwear, one towel, and took one section of fabric from the office couch.

At 1818, Appellant texted Sgt November asking, "Did you pick up your baby".[21] She did not respond. Eventually Appellant came back to base that afternoon and was ordered to go to the NCIS field office. Appellant also was ordered to undergo a SAFE. Appellant's OIC had been ordered by the XO to take Appellant home when he was done with NCIS.[22] Sometime around 2300, he drove Appellant home. Instead of leaving base through the most direct gate to Appellant's home, they exited through a different gate. Just outside the gate, Appellant asked his OIC to stop and Appellant briefly exited the vehicle. He went to some nearby bushes and retrieved a cracked iPhone. He made two brief and unremarkable phone calls to his wife, both in Spanish, which were along the lines of "I'm on my way back."[23] Appellant told his OIC why he wanted him to stop and never tried to conceal what he was doing, though in his OIC's opinion, Appellant could have concealed his actions because "it was dark."[24] The OIC later told Appellant that he would have to report the phone retrieval to the command, which he did. Appellant never asked him to not report it or to lie about anything.

The following day, NCIS agents returned to Appellant's office. Around 1345, they happened upon Appellant as he was leaving the building. They searched his car and seized a Samsung Galaxy S3, which was not the phone he retrieved from the bushes the night before. The Government believed at the time that Appellant was obstructing justice, though he was never charged with

---

[21] *Id.*

[22] It is unclear whether Appellant knew exactly why he was being summoned back to base. When his OIC told him that the XO needed Appellant to speak with investigators, Appellant told his OIC that he "had already spoken with an investigator." R. at 539. Based on the OIC's testimony, he may have assumed Appellant meant some other investigation at the unit.

[23] R. at 531.

[24] R. at 534.

that. When the Samsung phone was searched, it was discovered that it was in "factory reset" mode, indicating either that the phone had been reset or had just been purchased. During trial, the military judge admitted a receipt from the base exchange showing Appellant purchased this phone only about half an hour before it was seized by NCIS.[25]

Eventually, from Sgt November and Appellant's SAFEs, the search and seizures from Appellant, and the voluntary relinquishment from Sgt November, the Government collected the following items for DNA testing: Sgt November's underwear and bra; five pairs of Appellant's underwear; a vaginal swab and a genitalia swab from Sgt November; a penile and scrotal swab from Appellant, and buccal swabs from each. The items were all sent to a lab for testing.

Sgt November's vaginal swab revealed no male DNA inside her vagina. The swab of her genitalia (done externally to the vagina on the labia minora) and the inside crotch area of her underwear did not have a DNA match with Appellant. However, using a method of testing that screens out female DNA and only looks for male DNA (known as Y chromosome short tandem repeat [Y-STR] testing), it did show male DNA. The male DNA from her genitalia swab did not match Appellant, but according to the Government's DNA expert, "[t]he probability of randomly selecting a male individual with [this DNA] profile in the same population group as [Appellant] given that we've already observed it once, is . . . 1 in 140 for Hispanic individuals."[26] Similar to the results from the genital swab, the DNA expert testified that the probability of randomly selecting someone among Hispanic individuals with this DNA profile was 1 in 810. Sgt November's bra contained insufficient DNA to include or exclude Appellant.

Appellant's penile swab and his scrotal swab had insufficient DNA (besides his own DNA) to show Sgt November's DNA. Four of Appellant's five sets of underwear also showed no DNA from Sgt November. One pair of his underwear showed a profile for Sgt November and "one sperm cell that was microscopically identified."[27] Other than that, no semen was discovered on anything.

The DNA expert elected not to test Sgt November's underwear for blood because there were no visible signs of any. The underwear was black with an interior white lining and was admitted into evidence.[28]

---

[25] Def. Ex. A.

[26] R. at 419.

[27] R. at 432.

[28] Pros. Ex.16.

About two months before the contested phase of the trial, the Government requested Sgt November volunteer her cell phone for forensic analysis. She refused. The Government never obtained a search authorization for it, though it did obtain Sgt November's cell phone records from her provider. Finally, Sgt November did provide screen captures from her phone of the text messages that she and Appellant sent to one another in the two weeks leading up to the day of the incident and the messages sent that day.

### 2. *General court-martial*

Appellant's trial lasted four days. He was charged with an orders violation for misusing his government office for sexual activity [Charge I]; two specifications of sexual assault by bodily harm for digitally penetrating Sgt November's vagina and for penetrating her vagina with his penis [Charge II, Specifications 1 and 2]; one specification of abusive sexual contact for grabbing Sgt November's breast [Charge II, Specification 3]; fraternization [Additional Charge I]; and adultery [Additional Charge II].

The Government presented testimony from three NCIS agents and one agent from the Criminal Investigative Division, the two nurses who performed the SAFEs of Sgt November and Appellant, and a DNA expert. Three of the gunnery sergeants (all since retired) who were in the building that day testified as did Appellant's OIC who drove him home from NCIS. Appellant's squadron XO also testified. The members also heard testimony from Sgt November. The Government's main documentary evidence was the report of the DNA testing, photographs of Appellant's office and conference room area, Sgt November's cell phone records, and the screen captures she provided from her phone.

The defense case consisted of three good military character witnesses and a recall of one of the gunnery sergeants who was a Government witness. There was also stipulated testimony from Sgt November's victim's legal counsel [VLC] concerning the request to turn over her cell phone for forensic analysis.

Sgt November testified as to what happened in the office. As discussed above, she texted and spoke with Appellant prior to arriving at his building. She asked for help getting her uniform ready and, because she had never been to his actual office, he met her outside the building. She walked inside with him, past the meeting that was just about to start. There were five or six senior Marines about to have a meeting. She and Appellant went into his office. This happened just after 0805. She sat down on the couch and Appellant sat at the desk. The overhead lights were on, as was Appellant's computer.

They were just talking about "random things" for "half an hour, 45 minutes" when Appellant mentioned their sexual encounter from years past.[29] Sgt November believed Appellant had physical or sexual things in mind and she told him she did not want to "mess my hair up" and protested that "people were going to hear us."[30] Appellant got up from his desk, turned off the lights—leaving only the glow from the computer screen for light—and locked the door. He sat down next to her on the couch and began kissing her. Sgt November testified that after they were "done kissing" she still told him that she did not want to do anything else and repeated her concerns over her hair and people being able to hear them.[31] But Appellant did not stop and he pushed her shorts (which had an interior lining) and her underwear aside and placed his fingers in her vagina. Then he took off his shorts and underwear and inserted his penis into her vagina for "maybe two thrusts."[32] Appellant was not "aggressively" holding her down, but Sgt November was leaned back on the couch.[33] She kept saying "stop" and finally pushed him away saying, "I'm not f***ing kidding."[34] Appellant stopped and went and turned the lights on. He put his shorts back on and then grabbed her breasts under her shirt and over her bra, telling her that he liked her breasts. The whole episode lasted "not more than a minute."[35]

After this, Appellant answered a phone call and exited the office, leaving the door open. Sgt November closed the door, and rolled the sleeves of her utility blouse and put on her utility trousers and boots. Soon after, Appellant returned to the office, which was around the time one of the gunnery sergeants came in. Sgt November left the office and went to her car to retrieve her utility cover and came back to Appellant's office to return his cover. She then left and recalled saying, "Good morning, gentlemen," as she left.[36] She estimated that she was in the building for 10 to 15 minutes after the incident occurred.

Sgt November could not remember what hand Appellant used to digitally penetrate her. She was certain that Appellant locked the door by just pushing

---

[29] R. at 494, 495.

[30] R. at 473.

[31] R. at 474.

[32] R. at 475.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] R. at 504.

it closed and locking it. But in her NCIS interview she was "not sure" if Appellant had locked the door.[37] She denied touching Appellant's penis or sticking her hand down his pants. She described how Appellant removed his shorts. He did so while he was leaning over her on the couch with one foot on the ground, and he removed them over his running shoes without standing up.

Finally, Sgt November denied that anyone had asked her in the couple of months leading up to the trial ("in June … or May") if she would voluntarily relinquish her phone for forensic analysis.[38] Appellant and Government entered into a stipulation of testimony from Sgt November's VLC. The VLC was currently conducting an overseas transfer and was unavailable. His stipulated testimony was that in May 2017, the trial counsel asked him to discuss with Sgt November whether she would agree to relinquish her phone for forensic analysis and that NCIS would not be able to limit the parameters of its search of the phone to certain dates. The VLC would have testified that sometime in "late May or early June" he spoke to the trial counsel and explained that after discussing the request with Sgt November, she had declined to turn over her phone.[39]

One of the gunnery sergeants who had the office next to Appellant testified for the Government about a conversation he had the day following the incident. NCIS agents had already been to the office to seize some items and had "vaguely" briefed some of those present on why they were there.[40] He asked Appellant, "Hey what's going on? Are you okay?"[41] According to the gunnery sergeant, Appellant showed concern for his family and gave him a "rundown of what happened."[42] Appellant stated that Sgt November had come to the office for help to roll her sleeves and that "[a]t some point, she made an advancement

---

[37] R. at 497. We only consider Sgt November's NCIS interview for the purposes of trial defense counsel testing her memory and do not consider it as substantive evidence. We are especially mindful in conducting a factual sufficiency review, we are "limited to the evidence presented at trial." *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007).

[38] R. at 505.

[39] R. at 617; App. Ex. XLII.

[40] R. at 454.

[41] *Id.*

[42] *Id.*

towards him" but he "pretty much told her to stop."[43] But Sgt November "continued to egg him on and call him out for it."[44] Overall, concerning the rejection—according to the gunnery sergeant's recounting of what Appellant said—Sgt November did not "take it too well."[45]

After about three hours of deliberation, the members acquitted Appellant of digitally penetrating Sgt November's vagina, but convicted him of the remaining specifications.

## II. DISCUSSION

### A. The Convictions for Sexual Assault, Abusive Sexual Contact, and Adultery are Factually Insufficient

Before addressing the factual sufficiency arguments, it is important to explain *why* we are doing so and expound on how a service court of criminal appeal should follow Article 66(d) in reviewing a record of trial for legal and factual sufficiency. This Court's recent opinion in *United States v. Lee*[46] was instructive in how to resolve cases where there are serious questions concerning legal and factual sufficiency. In *Lee*, we set aside a finding of guilt for attempted indecent conduct because it was legally insufficient and thus, did not review whether it was factually insufficient. We did not do so because if our view of the law was incorrect, it could color our analysis of the facts. In addition, once a finding is legally insufficient, analysis should cease on that finding. If the government wishes to pursue certification based on that legal insufficiency, then CAAF can weigh in.

In *Lee* the appellant also challenged both the factual sufficiency of his adultery conviction and whether the evidence was properly admitted. Because we have an obligation to review each finding for factual sufficiency—unless legal insufficiency trumps that review—we did briefly address whether the finding was factually sufficient based on the evidence admitted at trial. We are obligated to conduct our factual sufficiency analysis, unless some extraordinary circumstance forecloses our ability to do so. In a single sentence, we merely stated the evidence admitted at trial was legally and factually sufficient. There

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *United States v. Lee* __ M.J. __, No. 202000239, 2022 CCA LEXIS 211 (N-M. Ct. Crim. App. April 5, 2022).

was no need to provide a detailed review of the evidence. First, the evidence for his guilt was fairly obvious. But more importantly, if there is an underlying prejudicial legal error that warrants remand for a new trial, then an appellant's "parting gift from a CCA should not be an evaluation by three [or more] appellate military judges of the strengths and weakness of the Government's case against him."[47] So, we found the evidence admitted against the appellant was the result of a prejudicial legal error and remanded. That way, if CAAF later reversed us, on remand to this Court, we would have already reviewed the evidence for legal and factual sufficiency.[48]

With respect to *Armendariz I*, it is not clear that our original review featured a legal and factual sufficiency review for all the findings. Several AOEs were briefed to this Court, including legal and factual sufficiency. The only one we discussed was the search authorization that CAAF ultimately found was proper. All we said for the remaining AOEs was that they were "either moot or lack merit."[49] While there is a fair argument that the Court meant that the legal and factual sufficiency AOEs were "without merit" because they could not ordinarily be "moot", we think for clarity's sake the best practice is the one we used in *Lee*. We also think factual sufficiency review is such an important and unique statutory right for an appellant that we must be certain it was properly conducted in each and every case. We thus proceed to a factual sufficiency review.

### 1. Standard of review and the law

Article 66, UCMJ, requires the service courts of criminal appeals to conduct a de novo review of the factual sufficiency of all cases it hears.[50] This "awesome, plenary, de novo power"[51] requires us to weigh all the admitted evidence and

---

[47] *United States v. Cooper*, 80 M.J. 664, 677 (N-M. Ct. Crim. App. 2020).

[48] Also, as a matter of judicial economy, this Court should still consider reviewing multiple issues that could lead to reversal and remand even on the same findings. For example, in *United States v. Edmonds*, 81 M.J. 559 (N-M. Ct. Crim. App. 2021), we found independent legal errors that both resulted in dismissal with prejudice. It would have been a waste of judicial resources to find one error, have the Judge Advocate General certify it to CAAF, and upon a possible remand, then proceed to find the other independent error.

[49] *United States v. Armendariz*, 79 M.J. 535, 557 (N-M. Ct. Crim. App. 2019) (rev'd).

[50] *United States v. Walters*, 58 M.J. 391, 395 (C.A.A.F. 2003).

[51] *United States v. Kelly*, 77 M.J. 404, 406 (C.M.A. 1990) (quoting *United States v. Cole*, 31 M.J. 272 (C.M.A. 1990)).

testimony at trial, make "allowances for not having personally observed the witnesses," and decide whether we are convinced of the Accused's guilt beyond a reasonable doubt.[52] In doing so, we take a "fresh" and "impartial look at the evidence" and apply "neither a presumption of innocence nor a presumption of guilt."[53] This does not mean that the evidence must be "free from conflict,"[54] but guilt must be proved beyond a reasonable doubt—the highest standard known to the law. If the evidence admitted at trial leaves us with a "fair and reasonable hypothesis except that of guilt," we are required to set aside the conviction.[55]

Appellant was convicted of one specification of sexual assault by bodily harm, one specification of abusive sexual contact by bodily harm, and one specification of adultery in violation of Articles 120 and 134, UCMJ.[56] For the Government to prove beyond a reasonable doubt that Appellant sexually assaulted Sgt November by committing bodily harm, the evidence must show that he penetrated her vagina with his penis without her consent. For the adultery finding, the evidence must also show Appellant penetrated her vagina with his penis, while he was married, and that the sexual intercourse was either prejudicial to good order and discipline or service discrediting. For the abusive sexual contact finding, the evidence must show Appellant touched Sgt November's breast without her consent.

### 2. Analysis

DNA evidence is not always dispositive for either the prosecution or for the defense. In this case, had the DNA closely tracked with Sgt November's testimony, it could have certainly provided corroborating evidence that placed the specifications for sexual assault, abusive sexual contact, and adultery into the realm of "beyond a reasonable doubt." But the DNA evidence did not do that. It did not appear to support Sgt November's account. First, the DNA evidence did not show Appellant penetrated Sgt November's vagina with his penis. This

---

[52] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[53] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[54] *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[55] *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 2-5-12. (10 Sept. 2014).

[56] He was also convicted of two specifications of violating a lawful general regulation (misuse of his government office and fraternization) under Article 92, UCMJ. We find these findings of guilt to be legally and factually sufficient. *Matias*, 25 M.J. at 356.

is crucial for the sexual assault and the adultery specifications. The DNA testing showed none of Appellant's DNA inside her vagina. It showed only a partial match for Appellant from the exterior of her vagina and the interior of her underwear. Appellant's penile swab could have shown DNA from Sgt November had there been vaginal penetration, but it did not. Appellant's scrotal swab showed only his own DNA. There was no semen, even as pre-ejaculate, detected on Sgt November or on Appellant, except for a single sperm cell in his underwear. That same pair of underwear had a DNA match on the inside for Sgt November. In short, the scientific evidence did corroborate Sgt November's claim of vaginal penetration. Nor was Appellant's DNA found on Sgt November's bra, to corroborate her claim of abusive sexual contact.

Just because DNA evidence does not "match up" with a complaining witness' account is not itself reason to find factual insufficiency, but this does force us to look even harder at the surrounding circumstances of the incident. Sgt November testified that this assault took place in Appellant's office. From the cell phone records, we have solid evidence of a timeline. Sgt November entered Appellant's office building around 0805 and immediately went with him into his office. She was finally outside of the building making a 44-second phone call to her boyfriend at 0855. This was 50 minutes after she entered the building. During that time, we know that she was actively sending texts to her boyfriend and a cousin. We also know that whatever else was occurring in the office, it included her actively using her phone consistently during the entire time period.

The issue of what happened to Sgt November's cellphone also gives us pause. A thorough investigation would have looked into the substance of those text messages. A text message could have been contemporaneous evidence of Sgt November's present sense impression or her then-existing mental, emotional, or physical condition. The fact that the Government did not obtain this information is not necessarily fatal to its case—though one can easily imagine the devastating use Appellant could have made of the substance of the texts if they were merely innocuous. But when Sgt November's own sworn testimony concerning whether she was ever asked to produce her phone was flatly contradicted by her own former VLC, this exacerbated an already bad situation for the Government. It is a fair inference that Sgt November did not want the substance of those text messages disclosed and she declined to produce them for the Government—which would have assuredly meant the Defense would also have received them—and then was less than candid in her testimony about that production request.

The overall circumstances surrounding the incident are also unusual. According to Sgt November, the door was locked, though it was disputed whether

it could be locked in the way in which she described. Even so, the record indicates the walls were very thin and voices could easily be heard through them. It is also undisputed that a meeting was occurring right outside the door with several staff noncommissioned officers and chief warrant officers. And this meeting lasted for about half of the time Sgt November was in Appellant's office.

The witnesses immediately after the fact also testified to Sgt November's composure. While it is true that sexual assault victims can behave in a myriad of ways, the record does not indicate Sgt November exhibited any immediate signs of distress or trauma. We also note that the DNA examiner did not even test for blood in Sgt November's underwear, because he saw no visual signs of any. The record indicates the underwear was black but had a white interior lining in the crotch area. Sgt November testified that when she went to the bathroom later, she saw blood in her underwear and became upset.

The record provides evidence of Appellant's version of events. He told another Marine that Sgt November came onto him and became upset when he would not escalate the sexual activity in his office. Given their prior sexual history, the DNA evidence, the continuous text messaging, and the issue with Sgt November's cell phone, Appellant's version of events—even if exaggerated—does not appear inherently unreasonable, especially given the flaws in the Government's case, and strikes us as a "fair and reasonable hypothesis except that of guilt." The Government was obligated to prove its case beyond a reasonable doubt. It did not.

We find the Government did not prove beyond a reasonable doubt that Appellant penetrated Sgt November's vagina with his penis or touched her breast, either with or without her consent. Thus, we find the evidence for the sexual assault [Charge II, Specification 2], abusive sexual contact [Charge II, Specification 3], and adultery [Additional Charge II][57] specifications to be factually insufficient. Having done so, we still must review the AOEs pertaining to the factually sufficient finding of guilt for Appellant's violation of a general order for the misuse of his government office for sexual activity [Charge I] and for fraternization [Additional Charge I].

---

[57] Appellant was convicted of Adultery in violation of Article 134, UCMJ, as it was previously defined in the 2016 version of the Code which required that an accused have penetrative sexual intercourse to complete the offense.

**B. The Military Judge Should Have Disclosed His Conflict**

*1. Background*

There were three military judges who presided over this case; one for arraignment, one for an Article 39(a), UCMJ, motions hearing held on 26 May 2017, and one for the trial. The military judge who presided over the 26 May 2017 session of court is the only one whose disqualification is at issue here. He was a Marine reservist and had presided over other trials in the Western Judicial Circuit. Two of the issues litigated before this military judge were the Defense motion to suppress the evidence seized from Appellant's phone because the XO was not legally allowed to authorize the search and the Government's M.R.E. 404(b) motion to admit evidence that Appellant concealed his cell phone outside the air station. These were substantive motions that shaped the trial.

Just over two weeks after the Article 39(a) session, the military judge applied for a civilian position as a Highly Qualified Expert [HQE] in support of Marine Corps trial counsel in the Western Region. The HQE works in Camp Pendleton, California, and works closely with the Regional Trial Counsel [RTC]. The RTC supervises all trial counsel in the Western Region. One of the roles of the HQE is to provide guidance in complex cases, especially sexual assault cases. Four days later, the military judge emailed the parties informing them of his rulings, but without any analysis. A written ruling was only attached to the record of trial about a month after the announcement of sentence. Appellant was never aware of the military judge's HQE application.

These facts concerning the military judge's prospective employment were unknown at the time of trial and during Appellant's first appeal to this Court and to CAAF. In an unrelated case, *United States v. Cabrera*—that is still pending with this Court—these facts came to light and we ordered a post-trial hearing. Appellant moved for production of the transcript of the post-trial hearing. The Government provided it to the Court and moved that it be attached to this record of trial.[58]

*2. Standard of review and the law*

When the issue of whether a military judge should have been disqualified is not raised until appeal, we review the issue for plain error.[59] A plain error

---

[58] Appellee's Answer at 8, n.3.

[59] *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011).

occurs when there is an error that is "plain or obvious" and results in "material prejudice."[60] However, plain error analysis most closely tracks with forfeiture, where an appellant failed to preserve an error at trial and thus inflicts a higher standard of review upon himself than if he had made a timely objection. We note that even forfeited constitutional errors—such as being denied the right to an impartial judge—are reviewed for plain error and, where the error is plain or obvious, require the government to prove the error was "harmless beyond a reasonable doubt" under *Chapman v. California.*[61]

Here, Appellant never knew—or could reasonably have known—about the issue of the military judge's prospective employment until after his *first* appeal to this Court. Without any disclosure from the military judge, Appellant had no opportunity for voir dire or challenge on this issue; consequently, there were no findings of fact, conclusions of law, or even a chance for a forfeiture or a waiver by Appellant. Therefore, we review this alleged constitutional error de novo and test for prejudice under the *Chapman* standard. "In applying a de novo standard, we follow the guidance of [CAAF], which has applied the same standard when facing questions that the appellant could not reasonably have raised at trial."[62]

"An accused has a constitutional right to an impartial judge."[63] "In the military context, the appearance of bias principle is derived from R.C.M. 902(a): 'A military judge shall disqualify himself . . . in any proceeding in which the military judge's impartiality might reasonably be questioned.'"[64] Determining whether a military judge exhibits an appearance of bias is conducted under an "objective standard," though we "recognize the somewhat subjective character of this ostensibly objective test."[65] "Any conduct that would lead a reasonable

---

[60] *Id.*

[61] *United States v. Torvachavez*, 78 M.J. 458, 463 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967).

[62] *United States v. Munoz*, No. 201200185, 2013 CCA LEXIS 45 at *4, n.2 (N-M. Ct. Crim. App. Jan. 31, 2013) (unpublished) (citing *United States v. Rose*, 71 M.J. 138, 143 (C.A.A.F. 2012)).

[63] *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (citations and internal quotation omitted).

[64] *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012).

[65] *In re Al-Nashiri*, 921 F.3d 224, 234 (D.C. Cir. 2019) (citing and quoting *Pepsico, Inc. v. McMillen* 764 F.2d 458, 460 (7th Cir. 1985)).

man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification."[66]

"Because not every judicial disqualification requires reversal" we use the Supreme Court's standards from *Liljeberg v. Health Servs. Acquisition Corp.*[67] to "determine whether a military judge's conduct warrants that remedy to vindicate public confidence in the military justice system."[68] The three *Liljeberg* factors are: (1) "the risk of injustice to the parties in the particular case", (2) "the risk that the denial of relief will produce injustice in other cases" and (3) "the risk of undermining the public's confidence in the judicial process."[69]

### 3. Analysis

We consider this from the perspective of a reasonable person who is aware of all the circumstances. We also are not deciding whether the military judge was actually biased, but whether he might reasonably appear to be biased. Anytime a military judge is seeking future employment with one of the parties, it is a reason for concern. This is perhaps even more reason for concern when the military judge is seeking future employment with a government office with oversight over the prosecutors in the case before him. We are extremely mindful of *In re Al-Nashiri*,[70] a 2019 case before the U.S. Court of Appeals for the District of Columbia Circuit arising from the military commissions in Guantanamo Bay, Cuba. The court granted Al-Nashiri's writ of mandamus because the military judge failed to disclose that he was seeking employment upon retirement from the Air Force with the Department of Justice, which was participating in the military commission prosecution over which he was presiding. This decision vacated nearly half-a-decade's rulings by the military judge in the prosecution of Al-Nashiri, who is accused of orchestrating, among other things, the al Qaeda attack on the USS *Cole* that killed 17 Sailors.

While the military judge's actions are nowhere close to the missteps by the military judge in *Al-Nashiri*, the principle of appearance of bias is what matters. And the fact is that here, the military judge was seeking civilian employment with the office that oversees prosecutions in the very circuit in which he was presiding over courts-martial. This is a clear appearance problem. The

---

[66] *Martinez*, 70 M.J. at 157.

[67] *Liljeberg v. Health Servs. Acquisition Corp,*. 486 U.S. 847 (1988).

[68] *Martinez*, 70 M.J. at 159.

[69] *Liljeberg*, 486 U.S. at 864.

[70] 932 F.3d 224 (D.C. Cir. 2019).

military judge erred by not disclosing this to the parties—even after the fact—and inviting voir dire and challenge. Then, Appellant would have had an opportunity to make a record and an objection, or possibly even waive such an objection.

Appellant argues that the military judge's prospective employment with the regional trial counsel's office created an appearance of bias which he was required to disclose. That he did not and that he still ruled on substantive motions is evidence that risks undermining public confidence in the judicial process and warrants a reversal.

The Government concedes the military judge "should have disclosed his application for a position with Trial Counsel's employer or recused himself" and recognizes (citing and quoting *Al-Nashiri*) that his "employment application alone [was] enough to require his disqualification."[71] But the Government first urges us to review this under a plain error standard, arguing that because *Al-Nashiri* is not binding on this Court, that the error is not "clear under current law."[72] We disagree with this assessment. While *Al-Nashiri* is not binding on the Court, any number of CAAF opinions that stand for the proposition that a military judge must be free from the appearance of conflict provide a basis to find plain error. In any event, as stated above, we are conducting a de novo review rather than a plain error review because to do so would punish Appellant for forfeiting an objection he could never have made in the first place.

The Government also argues that Appellant has not suffered any "specific injustice."[73] It further argues that public confidence will not be undermined because of future reliance on *Al-Nashiri* and this Court's opinion in this case, which (presumably) would find error, but no prejudice. We disagree.

We compare this case with *United States v. Martinez*.[74] In that case, the military judge's supervising judge observed the guilty plea and twice passed a note to trial counsel instructing him to request a recess or informing him of a deficiency on the guilty plea colloquy. The supervisor also was inside the military judge's chambers during a recess and during deliberations. The trial defense counsel [TDC] observed all this but forfeited an opportunity to object. However, in clemency the TDC noted the appearance of partiality and acknowledged his error in not objecting at the time. He also indicated that his "modest request for clemency" would remove any prejudice from the error. The Army

---

[71] Appellee's Answer at 12 (citing and quoting *Al-Nashiri*, 921 F.3d at 237).

[72] *Id.* at 13.

[73] *Id.*

[74] *United States v. Martinez*, 70 M.J. 154 (C.A.A.F. 2011).

Court of Criminal Appeals affirmed, as did CAAF. CAAF held that while the actions of the military judge and the supervisor created an appearance that neither was impartial, there was no material prejudice, and it was not necessary to reverse the case to prevent the risk that public confidence in the military justice system would be undermined.

Here, we have a military judge who the Government concedes should have been disqualified because of his civilian employment application. The military judge ruled on substantive motions, some of which touched the specifications in this case that have not been set aside and dismissed with prejudice. This was also a contested case where, because the issue was not disclosed, Appellant had no opportunity to object or even an opportunity to seek a remedy in clemency.

*Al-Nashiri* was issued in 2019. It is fair to say that it was a landmark case that was widely circulated in military justice circles. It is also probably fair to say that since then military judges nearing retirement have been forthcoming and transparent about post-retirement employment, especially when it involves the Department of Justice or the Department of Defense. As the D.C. Circuit observed, "[o]ur willingness to enforce disqualification may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered."[75] In fairness to the military judge in this case, his employment application was submitted two years before *Al-Nashiri* was decided. We find no evidence of ill-intent on the part of the military judge. We are also confident had this occurred after *Al-Nashiri* that the military judge would have made the appropriate disclosures. Nevertheless, this did not happen and the appearance of bias existed.

When a military judge seeks civilian employment with the prosecution office in the same circuit in which he is presiding over courts-martial, this materially prejudices an accused's substantial rights. Every accused has a constitutional right to an impartial judge and the appearance of impartiality is part and parcel of that right. As *Chapman* itself states, the Supreme Court has recognized "that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error."[76] The *Chapman* Court specifically cited *Tumey v. Ohio,*[77] where a judge was not impartial because of

---

[75] *Al-Nashiri*, 921 F.3d at 239 (citing and quoting *Liljeberg*, 486 U.S. at 868) (internal quotations omitted).

[76] *Chapman*, 386 U.S. at 24, n. 8.

[77] *Tumey v. Ohio,* 273 U.S. 510, 535 (1927).

his pecuniary interest in the outcome of a criminal trial as an example of a constitutional error that could never be harmless. Here, the military judge does not have the pecuniary interest of the judge in *Tumey*, and it is more of an appearance of bias than an actual bias problem. Still, there is not enough daylight between the two to result in harmlessness beyond a reasonable doubt. The *Tumey* judge exhibited per se constitutional error that was not harmless. While this error does not rising to the level of the error in *Tumey*, it is still very close to it. The Government is unable to prove beyond a reasonable doubt that having a military judge who appears to be partial toward the prosecution is a harmless error.

Even with having found a constitutional error that is not harmless, we turn to the *Liljeberg* factors.[78] We find the "the risk of injustice to the parties in the particular case" favors Appellant because he, albeit unknowingly, had a military judge presiding over a portion of his trial who was seeking employment with the prosecution office overseeing the prosecutors who were prosecuting the case. And the Government concedes as much and also concedes that he should have been disqualified. This was not as attenuated as it might have been if this was a military judge seeking employment generally with the United States, the Department of Defense or the Department of Justice, or even a Marine Corps prosecution office in a different region. And it is this lack of attenuation that created the risk of injustice to Appellant.

The second and third *Liljeberg* factors—the risk that "denial of relief will produce injustice in other cases" and "the risk of undermining the public's confidence in the process"[79]—also both heavily favor Appellant. Should we affirm and provide our imprimatur to the military judge's failure to disclose that he was seeking employment with the prosecution office, we risk inviting military judges to find reasons to not disclose rather than to disclose. When such a fundamental constitutional right is at stake, we err on the side of disclosure. As the D.C. Circuit said in *Al-Nashiri*:

---

[78] The Court notes the Government's standing position that any test for prejudice beyond the "substantial rights of the accused" is inconsistent with Article 59(a), UCMJ. And the Government may be right. It would seem that any *Liljeberg* factors favoring an appellant would constitute a prejudicial error under Article 59(a). Likewise, it would seem that any *Liljeberg* analysis would be superfluous after a court has already found constitutional error that is not harmless beyond a reasonable doubt. *See United States v. Upshaw*, 81 M.J. 71, 79 (C.A.A.F. 2021) (Maggs, J., dissenting). But that is not before us and we are bound by CAAF precedent in *Martinez*.

[79] *Liljeberg*, 486 U.S. at 864.

> [I]t is beyond question that judges may not adjudicate cases involving their prospective employers. The risk, of course, is that an unscrupulous judge may be tempted to use favorable judicial decisions to improve his future employment prospects—to get an application noticed, to secure an interview, and ultimately to receive an offer. And even in the case of a scrupulous judge with no intention of parlaying his judicial authority into a new job, the risk that he may *appear* to have done so remains unacceptably high. Simply put, a judge cannot have a prospective financial relationship with one side yet persuade the other that he can judge fairly in the case.[80]

For the military judge to perform his "high function in the best way, justice must satisfy the appearance of justice."[81] The public's confidence cannot help but be undermined when a military judge presiding over a court-martial is seeking future civilian employment in the prosecutor's office.

We would add that it is an important distinction between a military judge who is seeking civilian employment, whether government or private-sector, and an active-duty military judge who is expressing a preference for future military assignments that are aligned with a prosecution function. We think the difference speaks for itself, but we stress that the appearance of bias analysis for this case, or even in *Al-Nashiri*, is fundamentally different from an active-duty military judge filling out a "preference sheet" with the Marine Corps Judge Advocate Division or the Navy's Office of the Judge Advocate General. Any appearance of bias problem would have to have something more than the realities of military life where military judges express a preference for future assignments within the Navy or Marine Corps. This is for the simple reason that a member of the public would not reasonably question a military judge's impartiality over this alone.

## III. CONCLUSION

The findings for Specifications 2 and 3 of Charge II and the sole Specification of Additional Charge II are **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings and sentence for the sole Specification under Charge I and the sole Specification under Additional Charge I, are **SET ASIDE** and the record is returned to the Judge Advocate General of the Navy

---

[80] *Al-Nashiri*, 921 F.3d at 235 (emphasis in the original) (internal quotations and citation omitted).

[81] *Liljeberg*, 486 U.S. at 864.

for remand to an appropriate convening authority with authority to order a rehearing.

Judge HOUTZ concurs.

DEERWESTER, Judge, (dissenting in part):

I dissent solely from the Court's holding in setting-aside the findings of guilty for Specifications 2 and 3 of Charge II and the sole Specification of Additional Charge II. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, I am convinced of Appellant's guilt of these offenses beyond a reasonable doubt and can find no reason to set-aside the members' findings.

FOR THE COURT:

S. TAYLOR JOHNSTON
Clerk of Court (Acting)